[S. F. No. 16947. In Bank. Dec. 15, 1943.]

LINDELL COMPANY (a Corporation), Petitioner, v. BOARD OF PERMIT APPEALS OF THE CITY AND COUNTY OF SAN FRANCISCO, et al., Respondents.

Johnson & Harmon for Petitioner.

Young, Hudson & Rabinowitz as Amici Curiae on behalf of Petitioner.

John J. O'Toole, City Attorney, Walter A. Dold, Chief

Deputy City Attorney, Morris Lowenthal, Ralph Scott and Boyd Oliver for Respondents.

CURTIS, J.—This is an original proceeding in mandamus to compel the respondent Board of Permit Appeals of the City and County of San Francisco to cancel its action in overruling the issuance of building permits to the petitioner, and to reinstate said permits and affirm the action of the Central Permit Bureau in granting them.

The petition was filed on September 27, 1943, and an alternative writ was issued returnable on October 5, 1943. The respondents—the Board of Permit Appeals of the City and County of San Francisco, the individual members of said board, and H. C. Vensano as Director of Public Works of said city and county—filed an answer and return. Also interposed herein were the demurrer and answer of certain real parties in interest, whose identity will be more particularly noted later in this opinion. The matter in controversy was then ordered submitted for decision. While the pleadings as so framed present certain factual disputes, these points of contradiction require no special mention here in view of the questions of law involved which are determinative of this proceeding.

Briefly stated, the following recital of events constitutes the basis of the petitioner's claim to relief: In October, 1942, in an effort to further action to relieve the existent inadequacies of the local housing situation, San Francisco's Board of Supervisors passed and said city's mayor approved an "emergency ordinance" (Bill No. 1936, Ordinance No. 1829, Series of 1939) which provided "for the waiver of health, safety and fire regulations pertaining to the occupancy of houses, homes and other structures for human habitation during the present war emergency." This ordinance empowered all "officials, commissions, bureaus and departments charged with the enforcing of building and housing regulations . . . [to] waive" any pertinent rule or regulation upon application by any owner, occupant, lessee or tenant, made to the proper department through the Central Permit Bureau. A prior ordinance, passed and approved in April, 1942, by the proper city authorities as above mentioned, had already provided for the "waiver of certain building regulations due to war emergency." (Bill No. 1657, Ordinance No. 1577, Series of 1939.) This ordinance, likewise declared effective for the

duration of the present war "unless . . . sooner repealed," recited in substance that because of the impossibility of obtaining many standard materials, "the substitution of other materials, both in quantity and kind, or different in design," would be permitted, so long as such variance would not, "in the opinion of the department, board or officer concerned, result in unsafe or insanitary construction, or create a nuisance or endanger the public health, safety or welfare."

Section 55 of the Building Code of San Francisco (San Francisco Municipal Code, part II, chapter I, article 3) required at all times the procurement of a building permit from the Central Permit Bureau preliminary to the commencement of any such construction work; section 56 of said building code outlined the procedure to be followed in making application for the necessary permit; and section 59 of said building code provided that "the Department of Public Works shall ascertain whether such [previously filed] plans and specifications embody all requirements applicable by law and ordinance in such case, and if the requirements be met shall issue a building permit to the applicant."

Because of the existing shortage of housing facilities to accommodate defense workers in this city, the San Francisco Regional Office of the National Housing Agency, after a survey and investigation made just prior to January 1, 1943, advised the home office in Washington, D. C., of the pressing need for additional houses in this locale in order that defense work might proceed with reasonable efficiency. It was recommended that authority be given for the erection of 1,000 additional single family dwellings. About January 22, 1943, the National Housing Agency approved this recommendation in its specification that 1,000 single family units be erected forthwith in San Francisco and, in pursuance of this program, it directed the Federal Housing Administration to take such action as would be necessary to facilitate prompt construction through private initiative. The latter agency immediately made an investigation of suitable areas respecting which it would be willing to advance financing for the construction to be undertaken, and allegedly certified to the War Production Board certain sections in the city as appropriate sites.

The petitioner, a San Francisco builder, acquired property within one of these purportedly acceptable areas—the residential tract known as Miraloma Park—and had plans and

specifications prepared for the erection thereon of 31 single family dwellings. The War Production Board granted priorities for materials for the proposed construction—an essential prerequisite to the initiation of any building program in this war period. Thereafter, in conformity with the terms of the above-mentioned pertinent ordinances and the sections of the Building Code of San Francisco, and about July 21, 1943, the petitioner applied to the Central Permit Bureau of said city for building permits for 27 of the dwellings. On August 24, 1943, like application was made for four additional permits. Each application complied fully with the procedural requirements of the local building laws and was accompanied by two complete sets of plans and specifications, as well as by the necessary fees. On July 29, 1943, the 27 permits first requested of the Central Permit Bureau were granted to the petitioner, and on September 2, 1943, the four additional permits were likewise approved. Following these respective rulings in its favor, the petitioner promptly started corresponding construction work, purchasing and moving materials onto the property, hiring and assembling workmen, and laying foundations for the dwellings as specified.

On August 4, 1943, an appeal from the action of the Central Permit Bureau in ordering the issuance of the first 27 permits to the petitioner for the erection of dwellings in Miraloma Park was taken to the Board of Permit Appeals of the City and County of San Francisco by one John L. Edwards, a home owner and resident of said tract, and by the Miraloma Park Improvement Club, Inc., as real parties in interest. The appeal was heard on August 11, 1943, and on September 1, 1943, the Board of Permit Appeals gave its decision affirming the action of the Central Permit Bureau, whereupon the petitioner continued with its construction work.

On September 4, 1943, the protestants filed with said Board of Permit Appeals a petition for rehearing of the appeal from the granting of the aforementioned 27 permits. In the application for rehearing they charged the petitioner with premature commencement of the construction work, with the location of the building project independent of the direction of any federal agency, and with the violation of certain building restrictions in Miraloma Park District—matters which the petitioner claims were fully considered at the original hearing of the appeal. This application for rehearing was granted, and during the pendency thereof the petitioner was

required to and did suspend its construction work. On September 10, 1943, the protestants filed an appeal from the action of the Central Permit Bureau in granting permits for the erection of the four additional dwellings, and the hearing with respect to this latter ruling was consolidated with the rehearing of the first appeal. On September 15, 1943, the consolidated hearing and rehearing was held, and on September 22, 1943, the Board of Permit Appeals rendered its decision reversing its prior ruling and ordering the cancellation of all 31 permits.

The petitioner thereupon applied directly to this court for a writ of mandate commanding the Board of Permit Appeals to reinstate the 31 permits covering the above-detailed construction work in the Miraloma Park District. This court, in the exercise of its discretion, deemed the questions here involved, by reason of the existent wartime emergency, to present matters of such public importance as to warrant its assumption of original jurisdiction in issuing the alternative writ, and thus obviate any delay in the final disposition of this proceeding. (Rule 56 of the Supreme Court, 22 Cal.2d 35; 16 Cal.Jur. 863-864, sec. 62; 34 Am.Jur. 823-824, secs. 25-26; *Voorhees* v. *Morse,* 1 Cal.2d 179 [34 P.2d 153].) However, mature consideration of the problem as submitted for decision, in view of the settled principle that the remedy of mandate is not available to control the exercise of official discretion or judgment, or to alter or review action taken in the proper exercise of such discretion or judgment, now compels the conclusion that the peremptory writ here sought by the petitioner must be denied.

■ San Francisco as a charter city which has brought itself within the condition of the "municipal affairs" amendments of 1914 to the California Constitution (art. XI, secs. 6 and 8) has the power of "municipal home rule" with respect to all matters of local or internal concern. (San Francisco Charter of 1932, Stats. 1931, pp. 2973, 2978; 18 Cal.Jur. 783, sec. 95; *Butterworth* v. *Boyd,* 12 Cal.2d 140 [82 P.2d 434, 126 A.L.R. 838]; *West Coast Adver. Co.* v. *San Francisco,* 14 Cal.2d 516 [95 P.2d 138].) In line with such principle of autonomous government, said city, by appropriate charter and ordinance provisions, has set up a plan of procedure regulating the issuance of permits for the erection of buildings within its territorial limits, undeniably a "municipal affair" over which it has supreme control. (*Brougher*

v. *Board of Public Works,* 107 Cal.App. 15, 24 [290 P. 140].)
■ Section 24 of the presently effective Charter of San
Francisco—the Charter of 1932, as amended—provides that
"the board of supervisors shall regulate, by ordinance, the
issuance and revocation of licenses and permits for the . . .
operation of businesses or privileges which affect the health,
fire-prevention, fire-fighting, crime, policing, welfare or zon-
ing conditions of or in the city and county" and shall specify
which department shall make the necessary investigations
and inspections and issue or deny the permits and licenses
therefor. In line with this provision of the organic law, the
Central Permit Bureau is designated as the agency empow-
ered to grant or refuse building permits (San Francisco
Municipal Code, part II, chapter I, Building Code, art. 3,
secs. 55-56) and its scope of action is defined in the permit
procedure regulation as follows: "In the granting or deny-
ing of any permit, or the revoking or the refusing to revoke
any permit, the granting or revoking power may take into
consideration the effect of the proposed business or calling
upon surrounding property and upon its residents, and in-
habitants thereof; and in granting or denying said permit,
or revoking or refusing to revoke a permit, may exercise its
sound discretion as to whether said permit should be granted,
transferred, denied or revoked." (Ordinance No. 3.0411, sec.
3; San Francisco Municipal Code, part III, art. I, Permit
Procedure, sec. 26.) This comprehensive language affecting
the issuance of *all* permits sought under authority of the
relevant San Francisco Charter and ordinance provisions
in plain terms vests the granting power with a "sound dis-
cretion" generally.

■ Nor is the situation altered as the result of the enact-
ment of the two aforementioned emergency measures, the
validity of neither of which is contested by any party to this
proceeding. These "waiver" provisions do no more than
*sanction* the authority of the granting power to issue permits
where compliance with building rules and regulations is pre-
cluded by wartime restrictions. The terminology is entirely
*permissive* in character, as reference to the following perti-
nent portions will indicate.

Considering first Ordinance No. 1829, *supra,* pertaining
to the waiver of health, safety and fire regulations, section 1
expressly states that the administrative officials charged with
the enforcement of building and housing standards *"may*

*waive* any ordinance, rule or regulation" applying to the use and occupancy of buildings "when *in the judgment* of [the] officer, board, bureau or commission the same is *necessary* in order to provide suitable habitation" for persons who cannot otherwise obtain housing or habitations; section 2 specifically forbids the waiver or setting aside of any "rule, law or regulation" when "such waiver or annulment of such rule, law or regulation would create a public or private nuisance or endanger the public health, safety or welfare of the people of the City and County of San Francisco"; section 3 requires that before any such rule, law or regulation is waived, annulled or set aside the petitioner shall make an application with the proper department setting forth in detail the nature and character of the requested waiver; section 4 authorizes the departments, boards, commissions and officers to make rules for the regulation of any waiver provided for in the ordinance; and section 5 provides that any waiver that is granted shall give no permanent right to the applicant "beyond the termination of the present war emergency, or beyond the repeal of [the] ordinance," and in any event "such waiver may be immediately revoked at any time by the department board, commission or officer which granted such waiver when *in the absolute discretion* of such department, board, commission or officer (a) such waiver is no longer necessary, or (b) such waiver if continued would create a public or private nuisance or would endanger the public health, welfare and safety of the people of the City and County of San Francisco." (Italics ours.) As to Ordinance No. 1577, *supra,* pertaining to the waiver of certain building regulations, section 1 specifies that whenever any building is about to be constructed and certain materials are provided by the building laws of San Francisco to be used in the construction, "and by reason of the rules, regulations or orders of the War Production Board of the United States . . . it is impossible to obtain or use the materials of the kind and quality or in the quantity, or of the design provided for by said building laws," the departments, boards or officers charged with the duty of issuing a permit for the construction *"may permit* the substitution of other materials . . . ; provided the use of said other materials, or the change in design thereof, will not, *in the opinion* of the department, board or officer concerned, result in unsafe or insanitary construction, or *create a nuisance or endanger the public health, safety or welfare"* (Italics ours); section 2 provides that

the head of each department whose approval is necessary for the granting of the permit must give approval for the substitution of materials; and section 3 requires that no substitution be allowed unless the proposed substitution appears in the plans and specifications.

Harmonious and co-extensive with the wide discretionary power thus vested in the Central Permit Bureau is the plan of appeal from decisions of that agency as established by pertinent San Francisco Charter and ordinance provisions. Section 39 of the San Francisco Charter creates the Board of Permit Appeals as the reviewing agency here concerned and defines its powers, duties and jurisdiction. After doing so, it provides as follows: "Any applicant for a permit or license who is denied such permit or license by the department authorized to issue same, or whose license or permit is ordered revoked by any department, or any person who deems that his interest or property or that the general public interest will be adversely affected as the result of operations authorized by or under any permit or license granted or issued by any department, may appeal to the board of permit appeals. Such board shall hear the applicant, the permit-holder, or other interested parties, as well as the head or representative of the department issuing or refusing to issue such license or permit, or ordering the revocation of same. After such hearing and such further investigation as the board may deem necessary, it may concur in the action of the department authorized to issue such license or permit, or, by the vote of four members, may overrule the action of such department and order that the permit or license be granted, restored or refused." Related provisions treating of "Permit Procedure" before the Board of Permit Appeals are found in the San Francisco Municipal Code, part III, article 1, sections 8-16, inclusive. In passing, mention should be made of two of these sections. Section 8 provides in part as follows: "Pending decision by the Board of Permit Appeals, the action of the department in granting, revoking, or authorizing the transfer of any permit shall be suspended." Section 16 recognizes the propriety of rehearings in the following language: "Rehearings may be had only upon motion of a member of the Board and upon the vote of at least four (4) members thereof."

As so constituted the Board of Permit Appeals in its appellate jurisdiction, like the Central Permit Bureau in its original consideration of the case, is an administrative tri-

bunal empowered to exercise full discretion in passing upon the matter as submitted for decision. Indicative of such respective freedom of function is the observation that neither the San Francisco Charter nor related sections of the Municipal Code governing permit procedure provide for the making of any findings of fact by the Central Permit Bureau; nor is there any provision anywhere for the statement in writing of the reasons of the bureau or the board for granting or denying a permit. Moreover, the above quotation from section 39 of the charter clearly contemplates a *full* hearing of the case brought before the Board of Permit Appeals, where after considering the matter on its merits as presented by the applicant, the "head or representative of the department" in vindication of the result reached at the initial hearing, and the interested parties therein, said board is authorized to make final disposition of the application for the permit. In view of such elaborate provision for the hearing on appeal it cannot be argued that the designated appellate board—the Board of Permit Appeals—was in any way limited or restricted in its consideration of the instant case, in the light of the disputed issues of fact as to how the proposed construction of the defense housing project in Miraloma Park, a first-class residential district, would affect the public health, safety or general welfare. Certainly the Board of Permit Appeals, in reaching a decision in the matter, possessed at least the discretion which the Central Permit Bureau had—particularly when it is remembered that the protesting property owners, as interested parties under the express specification of the charter, were at the hearing before said board for the first time given an opportunity to express their views in protection of their interests in the district.

In these circumstances the contention of the petitioner that the authority of the Board of Permit Appeals was confined to a determination of whether there has been compliance with the municipal ordinances regulating permit procedure, as presumably found by the Central Permit Bureau in granting the permit, is untenable. The cases upon which the petitioner relies to support its argument as to the limited appellate function of the board are inapplicable here for they concern situations where the administrative officials were compelled to act in a particular way either because they were without discretion in the premises upon the happening

of the prescribed contingency (*Stockton & Visalia R. R. Co.* v. *Stockton*, 51 Cal. 328; *Sheehan* v. *Board of Police Commrs.*, 47 Cal.App. 29 [190 P.51]) or else having a mere "supervisorial discretion," the facts as admitted or, established were susceptible of but the single construction that the aggrieved party was entitled to the relief sought. (*Tulare Water Co.* v. *State Water Com.*, 187 Cal. 533 [202 P.874].) In the present case, the Board of Permit Appeals, invested by charter provision and related municipal ordinances with complete power to hear and determine the entire controversy, was free to draw its own conclusions from the conflicting evidence before it and, in the exercise of its independent judgment in the matter, affirm or overrule the action of the Central Permit Bureau.

▇ It is the general rule that the writ of mandamus may not be employed to compel a public administrative agency possessing discretionary power to act in a particular manner. The court in response to appropriate application may compel such agency to act, but it may not substitute its discretion for the discretion properly vested in the administrative agency. (16 Cal.Jur. 809, § 28, and cases there cited; 34 Am. Jur. 856, § 68, with supporting authority.) In a proceeding of this character, challenging the propriety of decision of an administrative board, the attitude of the courts is well stated in the following language found in the case of *Maxwell* v. *Civil Service Commission*, 169 Cal. 336, 339 [146 P.869]) : "Courts should let administrative boards and officers work out their problems with as little judicial interference as possible. . . . Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere." Like expression of this general policy of the courts toward administrative agencies may be found in *Pratt* v. *Rosenthal*, 181 Cal. 158, 164 [183 P.542] ; *Mann* v. *Tracy*, 185 Cal. 272, 274 [196 P. 484] ; *Bank of Italy* v. *Johnson*, 200 Cal. 1, 31 [251 P.784] ; *Mitchell* v. *McKevitt*, 128 Cal.App. 458, 465 [17 P.2d 789] ; *Dierssen* v. *Civil Service Commission*, 43 Cal.App.2d 53, 59 [110 P.2d 513] ; and *Hansen* v. *State Board of Equalization*, 43 Cal.App.2d 176, 179 [110 P.2d 453].

▇ To meet the condition implicit in this statement of the settled law in California as reflected in the above cases, the petitioner claims that the Board of Permit Appeals acted arbitrarily, unreasonably and capriciously in granting a re-

hearing in this matter and then reversing its previous ruling in affirmance of the action of the Central Permit Bureau; that such procedure amounts to an abuse of discretion by the administrative board, which is subject to correction in a mandamus proceeding. (18 Cal.Jur. 902, sec. 195.) In this connection the petitioner maintains that the board having considered at its original hearing and passed upon all the related questions of fact—such as the effect of the erection of the low cost housing units upon the value of the surrounding property in the district, the probability of such construction changing the character of the neighborhood and developing a slum area therein at the termination of the war, the materiality of the necessary variance in building standards with reference to various tract restrictions, the distance of local war plants and defense industries from the Miraloma Park land in contrast to their proximity to other available sections of the city, the added strain upon the existent transportation facilities, as well as upon the police and fire service furnished the district incident to the completion of the new living quarters and the resultant influx of people seeking such accommodations—said board was without authority to review such contested issues and revoke its prior determination of the case. To sustain its position in this regard the petitioner cites certain New York decisions holding that an administrative board like the respondent board is devoid of power to reopen and rehear a proceeding *which has once been terminated.* (*People ex rel. Swedish Hospital* v. *Leo,* 120 Misc. 355 [198 N.Y.S. 397], affirmed, 215 App. Div. 696 [212 N.Y.S. 897]; *McGarry* v. *Walsh,* 213 App. Div. 289 [210 N.Y.S. 286]; *Town of Greece* v. *Smith,* 256 App. Div. 886 [9 N.Y.S. 2d 21].) The foregoing italicized language reveals the distinct premise of such decisions. Typical is the basic case of *People ex rel. Swedish Hospital* v. *Leo, supra,* concerning the power of the Board of Standards and Appeals of the City of New York in dealing with an appeal to it from the action of the Superintendent of Buildings refusing a permit for an automobile garage under zoning regulations. In accordance with its own precise rule of procedure specifying the manner for *the final disposition of a case before it,* said board *by formal resolution* affirmed the decision on appeal and denied the application. A few weeks thereafter the board *reopened* the proceeding and after a hearing upon the same evidence and circumstances, it reversed its previous determination and granted the appli-

cation sought: The rules governing the practice of the board made no provision for such rehearing once the matter had been *finally closed* upon adoption of the resolution prescribed as expressive of the board's ruling *terminating* the case. In the light of its thus limited jurisdiction in the hearing and disposition of appeals, the board's reconsideration of its prior decision constituted an act in excess of its power and was therefore invalid. Such situation is totally unlike the instant case as disclosed by the record herein, where the rehearing by the Board of Permit Appeals represented not the reopening of a matter once closed but simply the exercise of a *continuing jurisdiction* incident to its *final* determination of the case, in pursuance of section 16 of the San Francisco Municipal Code, part III, article 1, *supra*.

■ Said section 16, as above quoted, *expressly authorizes a rehearing* upon motion of a member of the board and the vote of at least four (of the five) members thereof. This ordinance provision is wholly consistent with the broad discretion conferred upon the board in passing upon a case on appeal under authority of section 39 of the San Francisco Charter, *supra*, providing that after ''hearing and *such further investigation as the board may deem necessary* it may concur in the action of the department authorized to issue . . . [the] permit, or, by the vote of four members, may overrule the action of such department and order that the permit . . . be granted, restored, or refused.'' In the exercise of its lawful right thus to grant a rehearing, the Board of Permit Appeals, by its own rule adopted in supplementation of the governing municipal regulations, has specified that the ''application must be filed within ten days from the date of decision as to which a rehearing is sought'' and has detailed the following procedural conditions: ''The applicant . . . shall submit a written request setting forth succinctly the grounds upon which such rehearing is requested . . . If new evidence is relied upon as a ground for rehearing the application shall show: (1) the nature and character of the new evidence; (2) the names of the witnesses or a description of the documents to be produced; and (3) why the evidence was not produced at the original hearing. Failure to exercise due diligence to produce the evidence at the previous hearing will be deemed ground for the denial of the petition.''

The record discloses that three days following the board's adverse ruling upon their appeal in connection with the Cen-

tral Permit Bureau's granting of 27 permits to the petitioner for the construction of war housing units in Miraloma Park District, the above-mentioned real parties in interest made written application to the board for a rehearing upon the following grounds: (1) That the petitioner had violated section 55 of the Building Code, *supra*, by commencing construction work on its Miraloma Park property prior to the issuance of permits by the designated municipal authority (sec. 59 of the Building Code, *supra*), and that because of this unlawful act the petitioner succeeded in completing a considerable portion of the building project before the protestants had an opportunity to be heard by way of an appeal in this matter; (2) That while the houses were being "financed by F. H. A. loans, the location of the project was not directed or specified by the F. H. A. or any other Federal housing agency, it being contrary to the express policy and established practice of all such agencies to interfere in any way with local authorities in the location of any housing projects"; and (3) That the erection of the dwelling houses on lots not more than twenty-five (25) feet in width is in violation of the recorded "Declaration of Easements, Conditions and Restrictions" referable to the Miraloma Park District in that there "it is expressly provided that no lot . . . shall be re-subdivided in such a manner as to give any lot so re-subdivided an average width for the first one hundred (100) feet of depth of less than thirty (30) feet, together with a frontage of not less than fifteen (15) feet on any front street." The petition for rehearing concludes with the statement that "the foregoing points constitute newly discovered evidence . . . which could not with reasonable diligence have been discovered earlier and presented at the original hearing."

 Fairly construed, the application for rehearing presented by the real parties in interest must be deemed in substantial compliance with the board's aforementioned rule of procedure and, as such, a sufficient basis for its appropriate action. (*Bartholomae Oil Corporation* v. *Seager*, 35 Cal. App.2d 77 [94 P.2d 614].) It is true, as the petitioner notes, that the application, while conforming to the time limit for filing and the requirement as to the written specification of the grounds warranting reconsideration of the case, does fail to show "why the [alleged newly discovered] evidence was not produced at the original hearing." However, in consid-

ering the effect of such omitted matter, it must be remembered that the board, under authority of the municipal charter and related ordinance provisions, is expressly empowered to grant rehearings without limitation as to the grounds thereof. Such broad power to reconsider should not be interpreted with too much refinement, nor should it be hedged about with subtle technicalities so as to hamper the just disposition of cases by the board. A rule of procedure, adopted for the guidance and convenience of both the administrative tribunal and the litigants and designed to facilitate the dispatch of business by such tribunal, must receive an interpretation commensurate with its purpose. Accordingly, a mere formal deficiency in a timely-filed application as is here concerned would not operate to deprive the board of its lawful power to rehear the proceeding upon its merits. The sufficiency of the application in the light of the board's appellate functions simply constituted another matter within its jurisdiction calling for the exercise of discretion, and in the absence of a showing of an abuse thereof, it will be presumed that the board did not act arbitrarily or contrary to its official duty. (Code of Civil Procedure, sec. 1963, subd. 15; *Vaughn* v. *Board of Police Commrs.*, 59 Cal.App.2d 771, 777 [140 P.2d 130].)

 In support of the propriety of the board's determination to grant a rehearing in this case the real parties in interest herein recite the following circumstances as motivating factors. According to their claim, at the conclusion of the original hearing before the board's five members, three voted to deny and two voted to grant the permits, but that since section 39 of the San Francisco Charter, *supra*, requires the vote of four board members to overrule the action of the inferior administrative tribunal, the board affirmed the decision on appeal. Of the two members so voting to sustain the issuance of the permits, one allegedly was of the belief that the delay of the protesting property owners in taking their appeal allowed the petitioner to progress to such point in its construction program that it would be unfair to deny it the building permits as sought; and the other thought that the federal authorities had selected the site in the Miraloma Park District for the project undertaken by the petitioner and would refuse further war housing in San Francisco if the permits for such construction were denied. Seeking a means to correct the misconception of the facts in these important

particulars, the real parties in interest made said points the basis of their first two grounds for rehearing. Consistent with the scheme and purpose of its creation under the law, the board is bound to give due heed to all public considerations and private interests in passing upon the case. ██ An application for rehearing before an administrative tribunal so constituted as the Board of Permit Appeals is not to be construed with the same strictness required for instance in a motion for a new trial before a court of law. The fact that the rehearing was granted by the board indicates its conclusion that a proper disposition of the matter would involve more mature reflection and careful reconsideration of vital evidentiary points. The pertinent municipal charter and ordinance provisions above detailed give the board the power so to avail itself of the opportunity to undo and correct any error in judgment it deems it may have made as the result of a misconception of the merits of the appeal.

Reviewing the record herein in connection with the three grounds for rehearing presented by the real parties in interest, the following matters deserve some mention. ██ As to the first ground relating to the operation of an estoppel against the protesting property owners in this case because of a lack of diligence in asserting their interests before the petitioner's completion of a considerable part of the construction work, it appears, according to the pertinent dates mentioned in the fore part of this opinion, that the appeal from the Central Permit Bureau's ruling in favor of the petitioner was taken well within the ten-day limitation allowed therefor by ordinance provision (San Francisco Municipal Code, 1939, part III, art. I, sec. 8)—in fact, but *six* days intervened between the granting of the 27 building permits first sought in this matter and the filing of the appeal. Moreover, each such permit contained the following qualification: "This permit issued subject to appeal within 10 days to Board of Permit appeals. *Incur no expense, under this permit, until right of appeal has lapsed.*" (Italics ours.) Consistent with this stipulation is the further ordinance provision that "Pending decision by the Board of Permit Appeals, the action of the department in granting, revoking, or authorizing the transfer of any permit shall be suspended." (San Francisco Municipal Code, part III, art. I, sec. 8, *supra.*) The petitioner claims that the local housing shortage motivated its commencement of the construction work promptly upon the granting of the 27 permits by the

Central Permit Bureau and its consequent activity in "purchasing and moving materials onto the property and hiring and assembling workmen and laying foundations for [the] dwellings," procedure involving considerable expense but admittedly without sanction of the law, must be viewed in the light of the prevailing emergency conditions. While the petitioner's motives in so proceeding may well have been impeccable, its unauthorized action does not fortify its standing in the case upon any theory of equitable estoppel to deny the building permits, and the opposing considerations as to this feature of evidence presented a matter for the board, upon a full understanding of the facts, to determine in the exercise of its sound discretion.

 The second ground for rehearing relates to the policy of the federal authorities towards the location of a war housing project in a vital defense area. The protesting property owners herein maintain that the selection of sites for such building program is wholly a matter for decision by the local authorities, and that further federal war housing aid is not contingent upon the construction proceeding in any one particular section of the city. The petitioner does not dispute this proposition but simply adds the further, yet consistent, statement that "the Federal government has ruled that private houses during the war can be built only where streets are improved, utilities and sewers already installed, transportation facilities available, etc., so that no manpower or material will be called for in this regard; also, that this [Miraloma Park] area had been certified as acceptable for house building during the war." Moreover, all parties herein refer to the following telegram sent from a "Commissioner of the War Production Board, Federal Housing Authority, Washington, D. C." to the Board of Permit Appeals under date of September 28, 1943, a few days following the local board's decision of this case on rehearing, as expressive of the Federal government's attitude in the matter: "Am advised certain property owners have objected to the construction of war housing and that certain permits which have been issued have been revoked by your board. I recognize that the adoption of building standards and codes is purely a local matter. However, I call your attention to the fact that the War Production Board has adopted war housing construction standards which must be met in order

for builders to secure preference ratings entitling them to build war housing. *In my opinion war housing can be built under these standards which will not create slum conditions or adversely affect neighborhood property values providing that such housing is properly located.* This location feature is a part of our analysis in approving mortgage insurance applications. If your code is amended in such a way that war housing cannot be built under the war housing construction standards of the W.P.B., our office will not be able to recommend approval of priority applications to the W.P.B. It would seem therefore *if such action is taken* that no war housing can be built in San Francisco.'' (Italics ours.) From these observations it appears that the Federal agencies are concerned simply with the construction of the needed number of dwelling units in acceptable sections of the municipality viewed as a whole—that is, areas certified as suitable from the standpoint of existing public improvements—rather than with the location of any part of the building program in any one specified district. The importance of the board's complete understanding of this phase of the case in relation to the preservation of both public and private interests herein cannot be doubted, and in the exercise of its broad discretionary power under the law, the board's right to undertake the re-examination of the subject incident to a rehearing and the just disposition of the controversial issues involved must be recognized.

The third ground for rehearing concerns the charge that the petitioner's building is in violation of certain tract restrictions as recorded for the Miraloma Park District. Petitioner in its brief does not dispute this point of complaint. The materiality of digression from a settled section plan has been held a proper matter of consideration in connection with the enforcement of zoning regulations (*Zahn* v. *Board of Public Works,* 195 Cal. 497 [234 P. 388]), and on a like basis such factor as so presented to the Board of Permit Appeals might have some bearing here in relation to the established building requirements. Moreover, on the same principle as affecting the petitioner's asserted *right* to the desired permits despite its admitted *nonconformity* with the district's standards both as to the aforenoted tract restriction as well as to certain other construction features, it is pertinent to note that the grant of such dispensation is a matter of grace, wholly within the scope of the discretionary power with which the authoritative board is vested. (*Rubin*

v. *Board of Directors of the City of Pasadena,* 16 Cal.2d 119, 125 [104 P.2d 1041]; *Regan* v. *Council of City of San Mateo,* 42 Cal.App.2d 801, 806 [110 P.2d 95]; *Otis* v. *City of Los Angeles,* 52 Cal.App.2d 605, 613 [126 P.2d 954].)

 In the present state of the record herein it is impossible to isolate the several factors which may have moved the Board of Permit Appeals to make its respective rulings. It was neither required by law, nor did it undertake, to set forth the reasons for its action at the conclusion of either the hearing or the rehearing in this matter. However, the proposition that said board, in making such investigation as it deemed the case warranted, was acting within its authority cannot be seriously challenged in view of the above-mentioned broad municipal regulations defining its appellate functions. Pertinent here is the observation in *Bartholomae Oil Corporation* v. *Seager,* 35 Cal.App.2d 77, 80 [94 P.2d 614] relative to a city planning commission's recommendation upon an application for a variance permit: "In connection with the action of such a commission, composed usually of laymen, the fact that a certain action is taken raises the presumption that the existence of the necessary facts had been ascertained and found."

 This holding as to the board's continuing jurisdiction in this matter does not impair the efficacy of the general principle that action by an administrative board, when the authoritative law intends it to be final, may not thereafter be revoked. The only question to be determined is when action becomes final. That is in every case a question dependent for its answer upon the scheme of the law by which power is conferred. Here it appears that finality is not reached while the Board of Permit Appeals, in the exercise of its discretion, has authority to grant a rehearing and arrive at a different conclusion as the result of a re-examination of the merits of the case. Confronted with conflicting considerations—on the one hand, the acute housing shortage in the Bay area, a situation which prompted the enactment of the aforementioned emergency ordinances for the city and county of San Francisco, *permitting* the waiver or relaxation of municipal building standards, as opposed, on the other hand, to the localization of the needed dwelling units in a manner consistent with the public health, safety, welfare and general prosperity of the municipality as a whole—the Board of Permit Appeals in its *final* ruling decided that the broad public interest re-

quired the denial of the building permits as sought by the petitioner for the Miraloma Park District, a determination based presumably on the premise that other available sections in the city would be more suitable for construction of the type here involved. In fact in this connection the petitioner does not dispute the point that in various parts of the city building under the war housing program is now proceeding in pursuance of duly issued permits. From this standpoint it cannot fairly be held on the present record that the situation herein was of such character as to preclude the board, in the exercise of a proper discretion, either from undertaking a further examination of the case in response to the appropriate application for rehearing or from reaching a different conclusion in consequence of such reconsideration. Accordingly, the propriety of the board's order rendered at the conclusion of its deliberations in connection with the consolidated hearing and rehearing in this matter as above mentioned, and cancelling all 31 building permits previously issued to the petitioner, must be sustained.

The alternative writ is discharged and a peremptory writ is denied.

Gibson, C. J., Shenk, J., Edmonds, J., 'Carter, J., Traynor, J., and Schauer, J., concurred.