[No. A107768. First Dist., Div. Four. Dec. 29, 2005.]

FRANCIS A. MARTIN III, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents.

## COUNSEL

Coblentz, Patch, Duffy & Bass, Jonathan R. Bass and Karen Jennings for Plaintiff and Appellant.

Dennis J. Herrera, City Attorney, Martin Greenman and Sarah E. Owsowitz, Deputy City Attorneys, for Defendants and Respondents.

## OPINION

MUNTER, J.*—The novel and very narrow issue presented is this: May a municipality lawfully require the owner of a private single-family residence who proposes to modify a portion of the interior of his residence, in an area not visible to the general public, to undergo the burden and expense of a review of his proposed project pursuant to the California Environmental

---

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Quality Act (CEQA)? The answer is "no." As we explain, although a municipality has very broad statutory discretion to grant or deny a required building permit, that authority does not extend to imposing CEQA review upon such an interior home project, even where the residence is listed as a city landmark and is located within an area registered as a state and a national historic district. What an owner plans to do to the private interior of his or her home does not implicate a significant adverse effect on the environment, which is the predicate for requiring CEQA review by a municipality.

A secondary issue is whether, apart from CEQA, a court will preempt administrative review under section 26 of the San Francisco Business and Tax Regulations Code of an application for a building permit. The answer again is "no." The exercise of section 26 administrative discretion must precede judicial intervention.

## BACKGROUND

The salient facts are without dispute: Francis A. Martin III (Martin) owns a house located on Broadway in San Francisco. That house, also known as the Atkinson House, was originally erected in 1853, making it one of the oldest structures in San Francisco. The noted 19th century architect Willis Polk designed the remodeling of its interior in 1893, the results of that and similar work by Polk becoming famous in architectural circles. In or about 1977, the Atkinson House was designated as a "City landmark." Since 1988, the Russian Hill neighborhood in which Martin's house is located has been listed on the National Register of Historic Places and the California Register of Historical Resources. The documentation leading up to the National Register listing noted generally that Willis Polk frequently utilized natural redwood interiors as a design feature.[1] However, a large number of enumerated factors contributed to the listing of the neighborhood, the Polk-designed redwood interiors being only one. For example, the listing documentation emphasized the exteriors of the buildings within the neighborhood and their relationships to their gardens and natural settings.

In 2001, Martin submitted plans to the City and County of San Francisco (City) for alterations to the interior and exterior of his house. The proposed changes contemplated the destruction of portions of the Polk-designed redwood interior. (See fn. 6, *post.*) In response to the submission of the plans, the City's Planning Department advised Martin that "[b]ased upon the information that has been presented, we believe that the interior space

---

[1] The "historical resource" that is listed on the National Register is not any interior design within Martin's home, nor even his house as a whole, but the neighborhood in which he resides. The registration was made in 1988, before Martin became the owner of the Atkinson House.

proposed for renovation is a feature that contributes to the Russian Hill-Vallejo Street Crest National Register Historic District"; that, "[a]s such, that space is considered to be a part of the historic resource"; and that consequently an "Environmental Review Officer" of the Planning Department "determined that the interior renovations proposed by the Martin family . . . are not Categorically Exempt from" further environmental review under CEQA (Pub. Resources Code, § 21000 et seq.). Therefore, the City asked Martin to submit an "Environmental Evaluation application" so that the Planning Department could "proceed to analyze the potential environmental impacts of the project and complete the appropriate environmental review document." Although the City expressed no objection to Martin's proposed changes to the exterior of his home, it refused to process any part of his permit application absent CEQA review.

The parties stipulated at trial that "[n]o portion of the interior of the Atkinson House is visible from any public street or sidewalk"; that "Mr. Martin's proposed interior alterations of the Atkinson House would not be visible from any public street or sidewalk"; that "[t]he City has refused to process any building permit application for Mr. Martin's interior alterations unless the proposed project is first submitted to further environmental review under . . . CEQA"; and that the City has "never in the past subjected proposed alterations to the interiors of private residences to environmental review under CEQA, other than the issuance of categorical exemptions." Nevertheless, the City took the position that "because . . . the interior of the Atkinson House is a historical resource and . . . the proposed interior alterations would cause a substantial adverse change in the significance of a historical resource," the City would require CEQA review of Martin's application as part of the City's discretionary powers to grant or deny approval of the desired building permit.

Instead of providing further information, Martin filed a complaint for declaratory relief, naming as defendants the City and its Planning Department. He prayed for a judicial determination "that CEQA does not apply to an application for a building permit . . . authorizing plaintiff's proposed renovations and improvements to the interior" of his house. The trial court conducted an evidentiary hearing at which it accepted stipulations offered by the parties, and heard the testimony of three witnesses mainly concerning operations and procedures of the Planning Department. The common theme of the testimony mirrored one of the stipulations—this was

the first time the Planning Department had taken the position that CEQA applied to alterations to the interior of a single-family private residence. The point of disagreement is about the proposed interior alterations, not those to the exterior.

Even though the only specific prayer for relief in Martin's complaint was for a declaration that CEQA does not apply to his proposed interior modifications, he injected into the case at trial a request for a further declaration. Thus, he also sought a pronouncement that the City has no discretion under section 26 of the San Francisco Business and Tax Regulations Code to deny a permit to renovate the interior of a private residence when the plans comply with the City's applicable building codes and zoning ordinances, and will not affect surrounding properties or residents.

Following receipt of posttrial submissions, the court issued a statement of decision concluding that Martin was not entitled to any relief. After judgment was entered, Martin perfected this timely appeal.

**REVIEW**

1. *The CEQA Issue*

■ On the CEQA issue, the City tried and won this case below, and briefed it on this appeal, along the lines of the following reasoning: A city ordinance, section 26 of the San Francisco Business and Tax Regulations Code (hereinafter section 26), gives the Planning Department—and the Board of Permit Appeals as the reviewing authority—almost plenary discretion in deciding whether to issue a building permit.[2] ■ CEQA specifies that decisions which involve the exercise of discretion by local authorities are left to local authorities. (Pub. Resources Code, § 21080, subds. (a) & (b); Cal. Code Regs., tit. 14, §§ 15002, subd. (k)(1), 15060, subd. (c)(1), 15061, subd. (a), 15268, subd. (a) & subd. (d), 15300.1, 15357–15359.) Armed with the discretion granted by section 26, the Planning Department must review Martin's project under CEQA, particularly because CEQA applies to projects that impact a "historical resource" such as Martin's house. (Pub. Resources Code, § 21084.1.) Moreover, courts will defer to local authorities until a final decision is made at the administrative

---

[2] The ordinance cited provides in pertinent part: "[I]n the granting or denying of any permit, or the revoking or the refusing to revoke any permit . . . the granting or revoking power may take into consideration the effect of the proposed business or calling upon surrounding property and upon its residents, and inhabitants thereof; and in granting or denying said permit, or revoking or refusing to revoke a permit, may exercise its sound discretion as to whether said permit should be granted, transferred, denied or revoked." (§ 26, subd. (a).)

level. (E.g., *Lindell Co. v. Board of Permit Appeals* (1943) 23 Cal.2d 303, 315 [144 P.2d 4]; *Maxwell v. Civil Service Commission* (1915) 169 Cal. 336, 339 [146 P. 869].) Therefore, until the City completes administrative proceedings, Martin's request for declaratory relief as respects CEQA was, and remains, premature.

■ There is considerable force to the City's arguments—in the abstract. Section 26 does vest administrative authorities with very broad discretion to decide whether and on what conditions an applicant will be granted a permit. And if the application is for a building permit, the fact that the applicant's project complies with zoning ordinances and building codes does not restrict the scope of that discretion. (*Lindell Co. v. Board of Permit Appeals, supra,* 23 Cal.2d 303, 311, 314; *Guinnane v. San Francisco Planning Com.* (1989) 209 Cal.App.3d 732, 739–740 [257 Cal.Rptr. 742].) In addition, it is undisputed that once the neighborhood that includes Martin's house was placed on the National Register of Historic Places as authorized by the National Historic Preservation Act (16 U.S.C. § 470 et seq.), it was automatically put on the California Register of Historical Resources (Pub. Resources Code, § 5024.1; Cal. Code Regs., tit. 14, § 4851(a)(1)) and thus became a "historical re-source" for purposes of CEQA. (Pub. Resources Code, § 21084.1.)[3] The crux of the disagreement is whether the changes Martin proposes to make to the interior of his home will have a substantial impact on the environment.

A prudential basis for deferring a decision on the ultimate issue until after the completion of administrative proceedings dissolved at oral argument when counsel for the City advised us that the Planning Department had already firmly determined that CEQA does apply. Counsel's statement can and will be treated as factually authoritative. (E.g., *Browne v. Superior Court* (1940) 16 Cal.2d 593, 599 [107 P.2d 1]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 665, p. 698.) Accordingly, the City will be deemed to have admitted that it has already been decided that the Martin interior modifica-tions must undergo CEQA review overseen by the Planning Department. If CEQA does not authorize that review, Martin should be spared the unneces-sary expense and delay it would entail. (See *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 592–593 [18 Cal.Rptr.3d 814]; *Myers v. Board of Supervisors* (1976) 58 Cal.App.3d 413, 425 [129 Cal.Rptr. 902].) We there-fore address the merits of the CEQA issue as framed at the outset of this opinion.[4]

---

[3] CEQA defines "an historical resource" as a "resource listed in, or determined to be eligible for listing in, the California Register of Historical Resources. Historical resources included in a local register of historical resources . . . are presumed to be historically or culturally significant for purposes of this section." (Pub. Resources Code, § 21084.1.)

[4] The issue we address—whether alterations to the interior of a privately owned single-family residence that has been designated a city landmark and listed on state and federal

■ The major purposes of CEQA are "to protect, rehabilitate, and enhance the environmental quality of the state." (Pub. Resources, § 21001, subd. (a).) The major procedure for achieving these goals is requiring preparation of an environmental impact report whenever a state or local agency proposes to approve or implement a "project" that "may have a significant effect on the environment." (Pub. Resources, §§ 21100, 21151.) CEQA has statutory definitions for these terms. "Environment" means "the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (Pub. Resources Code, § 21060.5.) "Project" is defined a number of ways, one of which is "[a]n activity that involves the issuance [of a] . . . permit . . . by one or more public agencies" that "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Pub. Resources Code, § 21065, subd. (c).) " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment" (Pub. Resources Code, § 21068) and includes "substantial adverse effects on human beings, either directly or indirectly." (Pub. Resources Code, § 21083, subd. (b)(3).)

■ CEQA authorizes the promulgation of guidelines for the implementation of its provisions by public agencies. (Pub. Resources Code, § 21083.) In the words of the statute, "[t]he guidelines shall specifically include criteria for public agencies to follow in determining whether or not a proposed project may have a 'significant effect on the environment.' " (Pub. Resources Code, § 21083.) Two of those guidelines further clarify the statutory definitions. According to one, " 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. The area involved shall be the area in which significant effects would occur either directly or indirectly as a result of the project. The 'environment' includes both natural and man-made conditions." (Cal. Code Regs., tit. 14, § 15360.) Just what constitutes a "significant effect on the

---

historic registers are subject to CEQA review—has not been decided in a reported decision. It is true that in *Citizens for Responsible Development v. City of West Hollywood* (1995) 39 Cal.App.4th 490, 501–502 [45 Cal.Rptr.2d 917], the court appeared to treat the interiors of two listed historic buildings as covered by CEQA, but the issue was not squarely addressed or actually decided. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents. [Citations.]." (*Webster v. Fall* (1925) 266 U.S. 507, 511 [45 S.Ct. 148, 69 L.Ed. 411]; see also *In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388 [53 Cal.Rptr.2d 81, 916 P.2d 476] [" '[i]t is axiomatic that cases are not authority for propositions not considered.' [Citation.]"].)

environment" is "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to a physical change may be considered in determining whether the physical change is significant." (Cal. Code Regs., tit. 14, § 15382.)

CEQA, like section 26, has an expansive scope of operation. Nevertheless, there are areas that even CEQA cannot reach. Thus, the following rules and authorities operate to restrict CEQA's potential application.

■ First, CEQA is not to be stretched beyond the "reasonable scope of the statutory language." (Cal. Code Regs., tit. 14, § 15003, subd. (f); *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 563–564 [276 Cal.Rptr. 410, 801 P.2d 1161]; *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 110 [126 Cal.Rptr.2d 441].) CEQA is not to be interpreted "in a manner which imposes procedural or substantive requirements beyond those explicitly stated in this division or in the state guidelines." (Pub. Resources Code, § 21083.1.)

■ Second, as this court recently held, while CEQA is to be liberally construed for the protection of the environment, like other statutes, it is to receive a practical, commonsense construction. (*Bowman v. City of Berkeley, supra,* 122 Cal.App.4th 572, 592–593.) Other courts likewise have so held. (See *Fall River Wild Trout Foundation v. County of Shasta* (1999) 70 Cal.App.4th 482, 490 [82 Cal.Rptr.2d 705]; *City of South Gate v. Los Angeles Unified School Dist.* (1986) 184 Cal.App.3d 1416, 1422–1423 [229 Cal.Rptr. 568]; *Billings v. California Coastal Com.* (1980) 103 Cal.App.3d 729, 741 [163 Cal.Rptr. 288].)

■ Third, in its first opportunity to examine CEQA, the California Supreme Court stated, "common sense tells us that the majority of private projects for which a government permit or similar entitlement is necessary are minor in scope—e.g., relating only to the construction, improvement, or operation of an individual dwelling or small business—and hence, in the absence of unusual circumstances, have little or no effect on the public environment. Such projects, accordingly, may be approved exactly as before the enactment of the EQA." (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 272 [104 Cal.Rptr. 761, 502 P.2d 1049], disapproved on other ground in *Kowis v. Howard* (1992) 3 Cal.4th 888, 896–899 [12 Cal.Rptr.2d 728, 838 P.2d 250].)

■ Fourth, while statutory exemptions ordinarily become relevant only where the statute would otherwise apply, it is noteworthy that one of the CEQA guidelines, known as the "common sense exemption," excludes activities "covered by the general rule that CEQA applies only to projects which have the potential for causing a significant effect on the environment. Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA." (Cal. Code Regs., tit. 14, § 15061, subd. (b)(3).) This exemption applies even where a local agency has discretion to approve or deny a project. (See *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 113 [65 Cal.Rptr.2d 580, 939 P.2d 1280], citing *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66], disapproved on other grounds in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 569–573, 575–576 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

■ Fifth, one of CEQA's provisions directs the promulgation of regulatory guidelines establishing "classes of projects which have been determined not to have a significant effect on the environment and which shall be exempt" from CEQA. (Pub. Resources Code, § 21084, subd. (a).) Among the exempted classes are (1) the construction of a new single-family residence (Cal. Code Regs., tit. 14, § 15303); (2) conversions of an existing structure "where only minor modifications are made in the exterior of the structure" (*ibid.*); and (3) "[i]nterior or exterior alterations" to an existing private structure which entail "negligible or no expansion of an existing use." (Cal. Code Regs., tit. 14, § 15301.) Allowances are made for unusual circumstances (Cal. Code Regs., tit. 14, § 15300.2), but the general principle remains—the construction of one single-family residence, or the ensuing modifications commonly undertaken, are not covered by CEQA. (E.g., *Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098 [23 Cal.Rptr.3d 321]; *Association for Protection etc. Values .v. City of Ukiah* (1991) 2 Cal.App.4th 720 [3 Cal.Rptr.2d 488]; *Gabric v. City of Rancho Palos Verdes* (1977) 73 Cal.App.3d 183 [140 Cal.Rptr. 619].) A local agency's discretionary authority cannot negate this exemption. (*Association for Protection etc. Values v. City of Ukiah, supra,* at pp. 732–733, citing Cal. Code Regs., tit. 14, § 15300.1.)

■ An examination of the CEQA definitions quoted above yields a common theme—in general, they deal with tangible physical manifestations that are perceptible by the senses. "Environment" is a very broad concept encompassing both tangible and intangible factors. But the intangible has CEQA consequence only if there is a nexus to a physically perceivable reality. The major statutory emphasis is on matters that can be seen, felt, heard, or smelled, i.e., consequences resulting from physical impacts on the environment. (See Pub. Resources Code, §§ 21080, subd. (e), 21082.2,

subd. (c); Cal. Code Regs., tit. 14, § 15064, subd. (e) [absent a "physical change," "[e]conomic and social changes resulting from a project shall not be treated as significant effects on the environment"]; Cal. Code Regs., tit. 14, § 15384, subd. (a); *Cathay Mortuary, Inc. v. San Francisco Planning Com.* (1989) 207 Cal.App.3d 275, 279 [254 Cal.Rptr. 778] ["CEQA will come into play only [with] a disruption of the physical environment"]; Cal. Code Regs., tit. 14, §§ 15064, subd. (d) ["the significance of the environmental effect" to be measured by "direct physical changes to the environment"], 15382 [" '[s]ignificant effect on the environment' " defined to include "adverse change in any of the physical conditions"], 15378, subd. (a) ["Project" defined to include, among other things, "a direct physical change in the environment"].)[5]

Having in mind the context of this case—a homeowner's enjoyment of his private living quarters—it is pertinent to observe that "[u]nder CEQA, the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons. [Citation.]" *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492 [14 Cal.Rptr.3d 308]. That sine qua non of CEQA is missing here; no one not actually inside Martin's house will have any percipient awareness that interior modifications have been made. A purely intellectual understanding that work by Willis Polk may no longer be within an unobservable part of another person's private living quarters will not suffice to establish a significant effect on the environment. That what Martin proposes may strike some as cultural vandalism will not bring it within the ambit of CEQA unless there is a physical impact on the environment. (See Pub. Resources Code, § 21082.2, subd. (b)); *Association for Protection etc. Values v. City of Ukiah, supra,* 2 Cal.App.4th 720, 734.) Destruction of an irreplaceable antiquity not being perceived by the public does not qualify as a significant effect. (Cal. Code Regs., tit. 14, § 15064, subd. (e) [absent physical change, "social changes resulting from a project shall not be treated as significant effects on the environment"].)

---

[5] This conclusion is bolstered by the Legislature's findings and declared intentions when it enacted CEQA. The measure was deemed necessary to "provide a high-quality environment that at all times is healthful and pleasing to the senses and intellect of man." (Pub. Resources Code, § 21000, subd. (b).) CEQA is concerned with "the management of natural resources" and "environmental pollution" caused by "waste disposal." (Pub. Resources Code, § 21000, subd. (f).) All public agencies are charged with responsibility for "preventing environmental damage" and protecting "environmental quality." (Pub. Resources Code, §§ 21000, subd. (g), 21001, subd. (f).) The Legislature declared it state policy to provide "the people of this state with clean air and water, enjoyment of aesthetic, natural, scenic, and historic environmental qualities, and freedom from excessive noise." (Pub. Resources Code, § 21001, subd. (b).) CEQA is also concerned with preserving "fish and wildlife populations" as well as "plant and animal communities." (Pub. Resources Code, § 21001, subd. (c).) In this context, the "intellect of man" becomes engaged only after the senses have perceived an adverse change in the environment.

Martin's proposed modifications, being to the interior of an existing single-family residence and not perceptible to others, lack the potential for causing a significant effect on the environment and are beyond the reach of CEQA. For all intents and purposes, what was visible before will be no different than what will be visible if the modifications are completed.[6] Both theoretically and practically, the concept of an "environment" must mean something more than what is perceivable only by the one person who wishes to change his or her own decor and those who may visit him at his home. The modifications here in issue would constitute a substantial *adverse* change neither to the environment (Pub. Resources Code, § 21068; Cal. Code Regs., tit. 14, § 15382) nor to a historical resource (Pub. Resources Code, § 21084.1). In fact, environmentally speaking, it is no change at all.

This is the plain import of the language of CEQA and the implementing guidelines. The parties have pointed to nothing in terms of legislative history, nor has our own research found anything, providing the least hint the Legislature intended a small scale alteration of the interior of a private home—even one with historical significance—to be subject to a full-blown CEQA review.

This conclusion finds additional support in considerations of practicality and common sense. If the Martin project were subject to CEQA, an environmental impact report, characterized in the guidelines as "the heart of CEQA" (Cal. Code Regs., tit. 14, § 15003(a)), might well be required (Pub. Resources Code, § 21151), which would in turn be available for public comment (Pub. Resources Code, § 21092; Cal. Code Regs., tit. 14, § 15087). We can scarcely believe the Legislature envisaged turning local agencies into censors of homeowners' plans for interior decoration. Moreover, the application of CEQA here would introduce a slippery slope, resulting in profound concerns for personal privacy. What if it were a bedroom or a bathroom that Martin wanted to alter? As stated in a different context, "we are dealing with the home, which has traditionally been subject to the highest protection against intrusions." (*Tom v. City and County of San Francisco* (2004) 120 Cal.App.4th 674, 684 [16 Cal.Rptr.3d 13].)

Without question, the preservation of San Francisco's architectural history is an important policy goal, and it has already received the City's attention: Article 10 of the San Francisco Planning Code is devoted to "Preservation of

---

[6] In fact, but for the happenstance of Martin applying for a permit to make the structural change of moving a staircase, this controversy might never have arisen. Had he simply decided to remove the nonstructural parts of the Polk design (i.e., described in a City document as "wood paneling, false ceiling beams, ornamentation, . . . cabinetry, molding, and trim" in the entry, living room, and dining room), it is very likely that no one would have known. Similarly, had Martin merely painted over, or carved his initials in, the Polk-designed redwood interior, there would have been no occasion for any assertion under CEQA to have arisen.

Historical Architectural and Aesthetic Landmarks." (S.F. Planning Code, §§ 1001–1015.) But it cannot be without significance that the City itself has confined its solicitude to the exterior of private homes that are landmark buildings. The Code *excludes* from the requirement of obtaining a certificate of appropriateness for proposed changes to a landmark building "interior alterations . . . on a privately owned structure."[7]

Attempts to preserve what are deemed culturally or historically significant buildings have generated passionate debate. (E.g., *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165 [105 Cal.Rptr.2d 214, 19 P.3d 567]; *League for Preservation of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896 [60 Cal.Rptr.2d 821]; *Citizens for Responsible Development v. City of West Hollywood, supra*, 39 Cal.App.4th 490; *Orinda Assn. v. Board of Supervisors* (1986) 182 Cal.App.3d 1145 [227 Cal.Rptr. 688]; *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco* (1980) 106 Cal.App.3d 893 [165 Cal.Rptr. 401].) However, CEQA is implicated only if such controversies "relate[] to any environmental issue." (*Cathay Mortuary, Inc. v. San Francisco Planning Com., supra*, 207 Cal.App.3d 275, 281.) That is clearly, as a matter of law, not the case here.

2. *The Section 26 Issue*

. The issue sought to be raised under section 26—whether the City has discretion under that section (and apart from CEQA) to deny Martin a permit to renovate his home's interior—stands on a different footing than that raised under CEQA, the reason being that, unlike the CEQA situation, the City has not made any determinations under section 26 as respects Martin's plans. In other words, as to Martin, the City has not purported to exercise its section 26 discretion in any direction or at all.

---

[7] The City requires the owner of a landmark site or building within a historic district to obtain a certificate of appropriateness for "[e]xterior changes . . . visible from a public street or other public place." (S.F. Planning Code, § 1006, subd. (2); see *id.* §§ 1006.2, subd. (a)(1), 1006.6, subd. (a).) The application for the certificate "shall be accompanied by plans and specifications showing the proposed exterior appearance" including "reasonable efforts . . . to preserve, enhance or restore, and not to damage or destroy, the exterior architectural features of the subject property." (S.F. Planning Code, §§ 1006.1, subd. (c), 1006.7, subd. (c).) Expressly excluded are situations where an owner seeks a permit "to make interior alterations only on a privately owned structure." (S.F. Planning Code, § 1005, subd. (e)(2).) In deciding whether to grant a certificate, the Planning Commission will endeavor to "preserve, enhance or restore, and . . . not damage or destroy, the exterior architectural features of the landmark." (S.F. Planning Code, § 1006.7, subd. (b).)

We do note that the Planning Commission will also consider whether an application will "preserve, enhance or restore, and . . . not damage or destroy . . . major interior architectural features," but only "where specified in the designating ordinance for *a publicly owned landmark*." (S.F. Planning Code, § 1006.7, subd. (b), italics added.) Ours is not that.

As previously noted, it is well established that section 26 administrative discretion is not cabined by specific criteria that may be set forth in city codes or ordinances.[8] Instead, that discretion is informed by the public interest, encompassing anything impacting the public health, safety or general welfare. (*Lindell Co. v. Board of Permit Appeals, supra,* 23 Cal.2d 303; *Guinnane v. San Francisco Planning Com., supra,* 209 Cal.App.3d 732.) Quoting from United States Supreme Court cases, the *Guinnane* court observed that the concept of public welfare is "broad and inclusive," and that "[t]he values it represents are spiritual . . . physical, [and] aesthetic as well as monetary." (*Guinnane v. San Francisco Planning Com.,* at p. 741.) Clearly, it cannot be said that section 26 administrative discretion properly includes consideration only of matters within the scope of CEQA.

It would do violence to the language and history of section 26 for a court to usurp the City's discretion by concluding in advance of administrative review that, as a matter of law, a particular permit application will not have an adverse effect on the public health, safety or general welfare. Absent the exercise of section 26 administrative discretion, the issue of the limits of the City's section 26 powers over Martin's project is not ripe for judicial resolution.

Wholly apart from what has been said, there are substantial practical reasons against judicial intervention in the City's section 26 review of Martin's permit application. By way of example, the city may well decide to issue the requested permit. Or a permit may be issued subject to conditions acceptable to Martin. In any event, while circumventing the planning authorities in the exercise of their section 26 discretion might be viewed as a concession to the shortness of life, it is not one countenanced by the law.

---

[8] Martin is not aided by his contention that in the past the City has not denied an application to alter the interior design of a private residence, except to require compliance with objective code requirements. Section 26 does not obligate the City to exercise its discretion with respect to all permit applications as to which it could do so. In the present context, there can be no waiver. "As a general rule, powers conferred upon public agencies and officers which involve the exercise of judgment or discretion are in the nature of public trusts and cannot be surrendered or delegated to subordinates in the absence of statutory authorization." (*California Sch. Employees Assn. v. Personnel Commission* (1970) 3 Cal.3d 139, 144 [89 Cal.Rptr. 620, 474 P.2d 436].) Similarly, as said in *Bank of Italy v. Johnson* (1926) 200 Cal. 1, 15 [251 P. 784], the head of an agency "may not by the adoption of any rule of policy or procedure so circumscribe or curtail the exercise of his discretion under the statute as to prevent the free and untrammeled exercise thereof in every case, for an attempt to do so would be for him to arrogate to himself a legislative function."

## CONCLUSION

The judgment is reversed and the case is remanded to the trial court with directions to (a) grant Martin's request for a judicial declaration that CEQA does not apply to his application for a permit to make interior modifications to his house, and (b) deny Martin's request for a declaration of rights under section 26.

Reardon, Acting P. J., and Rivera, J., concurred.

A petition for a rehearing was denied January 19, 2006.