[Civ. No. 38132. First Dist., Div. One. July 22, 1976.]

CITY OF SAN MARCOS, Plaintiff and Respondent, v.
CALIFORNIA HIGHWAY COMMISSION et al.,
Defendants and Appellants.

384

**COUNSEL**

Harry S. Fenton, Emerson Rhyner, John B. Matheny and O. J. Solander for Defendants and Appellants.

Thomas H. Crawford and Richard D. Ring for Plaintiff and Respondent.

Robert J. Logan, City Attorney (Livermore), Joseph Millard, Alfred A. Affinito, City Attorney (Pittsburgh), Kenneth C. Scheidig, City Attorney (Pleasanton), Rodney R. Atchison, City Attorney (Santa Cruz), John A. Van Ryn, City Attorney (Santa Maria), and Daniel J. Curtin, Jr., City Attorney (Walnut Creek), as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**SIMS, J.**—This is an appeal from a judgment which ordered that a peremptory writ of mandate issue ordering the respondents below (the California Highway Commission and Department of Transportation, the director of the department and its attorney) to grant an allocation[1] to

---

[1] In 1973, effective October 2, 1973 and operative July 1, 1974 (Stats. 1973, ch. 1153, §§ 1, 12 and 17, pp. 2385, 2389 and 2392), the Legislature enacted the provisions now found in sections 2452 and 2453 of the Streets and Highways Code. (See former §§ 2402 and 2403; and Stats. 1974, ch. 545, §§ 142 and 143, p. 1306, amending and renumbering those sections.) These sections read:

Section 2452. "Prior to July 1 of each year, commencing with 1974, the Public Utilities Commission shall establish a list, in order of priority, of projects which the commission determines to be most urgently in need of separation or alteration. Such priority list shall be determined on the basis of criteria established by the Public Utilities Commission. Where a project involves the relocation of railroad tracks or highways and the closure of grade crossings, the Public Utilities Commission shall indicate on the priority list which of the grade crossings eliminated would have been considered urgently in need of a grade separation."

Section 2453. "From the funds set aside pursuant to Section 190, as well as from any other funds that may be set aside for purposes of this chapter, the California Highway Commission shall make allocations for projects contained in the latest priority list established pursuant to Section 2452. Such allocations shall be made for preconstruction costs and construction costs; provided, that where allocations are made to a local agency, the requirements of Sections 2456 and 2457 shall first be met."

Section 2456 has provided since January 1, 1975: "An allocation for construction costs, including preconstruction costs if not already allocated, shall be made *to a local agency only if it* furnishes evidence satisfactory to the department[*] that all necessary orders of the Public Utilities Commission have been executed, that sufficient local funds will be made available as the work of the project progresses, that all necessary agreements with affected railroad or railroads have been executed that, if required, all environmental impact reports have been prepared and approvals obtained, and that all other matters prerequisite to the award of the construction contract can be accomplished within one year after the allocation. Local funds shall be deemed available to the amount of any general obligation bonds authorized but unsold if it is determined that such bonds may be issued and sold by the local agency at any time." (Italics added to show wording changed from "only to a local agency that" by Stats. 1974, ch. 1250, § 5, pp. 2703-2704.)

---

*"Department means the Department of Transportation ... " (§ 20.)

Section 2457 reads, "Preconstruction costs (engineering, right-of-way, preparation of

the City of San Marcos from fiscal year 1974-1975 funds in the State of California Grade Separation Fund[2] in the amount of $1,462,209 for the construction of a grade separation crossing.

The matter came before the trial court on the city's petition for writ of mandate, and the demurrer and answer filed by the respondents. After hearing oral argument and taking testimony the court ordered the matter submitted. Because of the exigency of the situation, as is reviewed below, the court on June 30, 1975, signed and filed its "Ruling Re Demurrer, Intended Decision, Proposed Findings of Fact and Conclusions of Law Re Petition For Writ of Mandate" and signed, filed and entered its "Judgment Granting Peremptory Writ of Mandate" from which this appeal is taken. A "Peremptory Writ of Mandate" was issued.[3] On appeal the respondents below contend that the court erred in overruling the demurrer interposed in the trial court, and that the judgment is not supported by substantial evidence. The arguments made under those general headings, and other particular points urged against the judgment may be condensed into the following contentions: (1) that the matter is

environmental impact reports, and utility relocation) expended by a local agency prior to any allocation shall be included in the total cost of the project even though expended prior to an allocation. Allocations shall be made for preconstruction costs to a local agency that submits evidence satisfactory to the department that the local agency will be able to meet the requirements for an allocation for construction costs, and that preconstruction costs will exceed the local share of the cost of the project. A local agency may also proceed with the advertising for bids and the construction of a project without prejudice to its right to receive an allocation if an allocation is, in fact, made for such project within the same fiscal year that the construction contract was awarded."

[2]The Grade Separation Fund referred to in the judgment represents the funds set aside pursuant to section 190 of the Streets and Highways Code, which was amended by the same statute as added the chapter dealing with "Grade Separation Projects." (Former ch. 8, §§ 2400-2411 [Stats. 1973, ch. 1153, § 12, pp. 2388-2391], now ch. 10, §§ 2450-2461 [Stats. 1974, ch. 545, §§ 139-151, pp. 1305-1309, and Stats. 1975, ch. 678, §§ 61-65, pp. 1493-1495].) It reads as follows: "In each annual budget report prepared by the commission and the department under Section 143.1, commencing with the 1974-75 fiscal year, the sum of fifteen million dollars ($15,000,000), which sum may include federal funds available for grade separation projects, shall be set aside for allocations to grade separation projects, in accordance with the provision of Chapter 8 (commencing with Section 2400) of Division 3. Commencing with the 1974-75 fiscal year, the funds set aside for such purposes by this section each fiscal year, or by any other provision of law, shall be available for allocation and expenditure without regard to fiscal years." (Stats. 1973, ch. 1153, § 3, p. 2387, effective Oct. 2, 1973, operative July 1, 1974.)

[3]Following the entry of judgment, the city on July 2, 1975, secured an order to show cause why the commission and the department should not be held in contempt for failure to comply with the peremptory writ of mandate issued pursuant to that judgment. On the return day of the order to show cause, a motion to quash the order to show cause was filed on behalf of respondents. On July 11, 1975, the motion was granted without prejudice to the city's right to renew the contempt proceedings after the judgment was final.

moot because the court erred in entering judgment on June 30, 1975, and no effective judgment for an allocation can be entered subsequent to that date; (2) that the city's petition is barred by laches; (3) the court erred in concluding that it was necessary to comply with the provisions of the Administrative Procedure Act in adopting regulations governing the review procedure by the department, particularly the requirement of a deadline for the receipt of an application for an allocation; (4) that the court erred in concluding that the application of the deadline (if it was otherwise valid) to the city's application was an abuse of discretion, was arbitrary because it conflicted with the legislative intent, and was unreasonable because of the protracted period prescribed for departmental review; (5) that the court erred in concluding that there was a sufficiency of compliance by the city with the statutory requirements for an allocation; (6) that the Legislature conferred upon the department the sole discretion to determine the manner in which an allocation should be made, and the court erred in attempting to control that discretion by writ of mandamus; and (7) that the court erred in finding that no other applicant, particularly an applicant with higher priority, was prejudiced by the order to make the allocation to the city.

As outlined below, we find that the foregoing contentions are without merit. The judgment of the trial court must be affirmed.

I

Section 632 of the Code of Civil Procedure provided and provides in pertinent part: " . . . In superior courts, upon such trial, the court shall announce its intended decision. Within the time after such announcement permitted by rules of the Judicial Council, any party appearing at the trial may request findings. Unless findings are requested, the court shall not be required to make written findings and conclusions . . . "

Subdivisions (a) and (b) of rule 232, California Rules of Court supplement the code provision, insofar as is material here, as follows: "(a) Upon the trial of a question of fact by the court, the court shall announce its intended decision by an oral statement, entered in the minutes, or by a written statement filed with the clerk. Unless such announcement is made in open court in the presence of all parties who appeared at the trial, the clerk shall forthwith mail to all parties who appeared at the trial a copy of the minute entry or written statement of intended decision, together with a copy of any memorandum of decision filed by the court and shall execute and file a certificate of such mailing.

[¶] The announcement of intended decision shall not constitute a judgment and shall not be binding on the court . . . [¶] The announcement of intended decision may state whether written findings of fact and conclusions of law, if requested, shall be prepared by the court or by a designated party. ⸌

"(b) A request for findings of fact and conclusions of law shall be served and filed within 10 days after oral announcement of intended decision in open court or, if mailing of the announcement of intended decision is required, within 10 days after such mailing . . . . "

It further may be noted that even if findings are not requested a proposed judgment must be prepared and served so that objections may be made to it. (Rule 232(h).) Subdivision (i) reads: "The court may, by written order, extend any of the times prescribed herein and at any time prior to the entry of judgment, whether or not a signed judgment is filed, it may, for good cause shown and upon such terms as may be just, excuse a noncompliance with the time limits prescribed for doing any act required by this rule."

Respondents point out that the court failed to comply with the foregoing procedure. Its "Ruling Re Demurrer, Intended Decision, Proposed Findings Of Fact And Conclusions Of Law Re Petition For Writ of Mandate" was filed on June 30, 1975. It concluded, "Counsel for petitioner to prepare a Writ of Mandate in accordance with the ruling of the court, and counsel for petitioner and respondents to submit any objections, modifications, additions to the above proposed findings of fact and conclusions of law in accordance with Rule 232 of the California Rules of Court." On the same day the court signed, filed and entered a judgment and issued a peremptory writ of mandate.

In *Hadley* v. *Superior Court* (1972) 29 Cal.App.3d 389 [105 Cal.Rptr. 500], the court pointed out, "An application for a writ of mandate or administrative mandamus is a 'special proceeding' governed by the provisions of section 1063 et seq. of the Code of Civil Procedure including section 1109. Section 1109 provides: 'Except as otherwise provided in this title [title 1 dealing with special proceedings], the provisions of part 2 of this code [Code of Civil Procedure commencing with section 307] are applicable to and constitute the rules of practice in the proceedings mentioned in this title.' Once an alternative writ has issued and an evidentiary hearing been had, it is contemplated that the proceeding shall be terminated by a judgment, not by a minute order

signed by the clerk. [Citation.] The judgment should dispose of the alternative writ theretofore issued as well as the matter of costs. [Citation.] In cases in which the trial court has determined a question of fact, the provisions of Code of Civil Procedure, section 632 and rule 232 of the California Rules of Court also apply. (Code Civ. Proc., § 1109, *supra; International Assn. of Fire Fighters* v. *City of Palo Alto,* 60 Cal.2d 295, 300-301 . . . ; *Delany* v. *Toomey, supra,* 111 Cal.App.2d at pp. 571-572.)" (29 Cal.App.3d at p. 394.)

It is also generally stated, "A judgment entered without findings where findings are required is a nullity . . . ." (*Ohio Cas. Ins. Co.* v. *Northwestern Mut. Ins. Co.* (1971) 17 Cal.App.3d 204, 207 [94 Cal.Rptr. 586]. See also *Supple* v. *Luckenbach* (1938) 12 Cal.2d 319, 322-323 [84 P.2d 52] [cf. Cal. Rules of Court, rule 2(c), as amended eff. Jan. 1, 1951, and *Estate of Hewitt* (1958) 160 Cal.App.2d 584, 585-586 (325 P.2d 113)]; *McBride* v. *Alpha Realty Corp.* (1975) 49 Cal.App.3d 925, 928 [123 Cal.Rptr. 270]; *Estate of Hewitt, supra; Petroleum Midway Co.* v. *Zahn* (1944) 62 Cal.App.2d 645, 651-652 [145 P.2d 371]; and *Hulbert* v. *All Night and Day Bank* (1916) 29 Cal.App. 765, 767 [157 P. 546].)

On July 7, 1975, respondents attacked the judgment on the foregoing grounds in their motion to quash an order to show cause issued on the city's application (see fn. 3 above), and they accompanied their motion with a request for findings of fact and conclusions of law. Two days later the city proposed modifications and additions to the findings set forth in the court's proposed findings of fact and conclusions of law which had been signed and filed June 30, 1975. The city's proposal contained the following recitals: "Said cause having been heard, evidence both oral and documentary having been introduced, and said cause having been submitted for decision, with the understanding of counsel and court that a decision must be rendered prior to the end of fiscal year 1974-75, on June 30, 1975, the court made a ruling re demurrer, intended decision, proposed findings of fact and conclusions of law re petition for writ of mandate on June 30, 1975 . . . . [¶] On June 30, 1975, counsel for petitioner prepared a judgment granting peremptory writ of mandate which was signed by the Honorable WALTER F. CALCAGNO on June 30, 1975, and entered on that date in the Judgment Book, Volume A-511, page 18. Said judgment was entered on June 30, 1975, in accordance with the understanding of counsel for petitioner and respondents and the court that the entry of said judgment may be necessary to preserve the rights of petitioner to receive an allocation from fiscal year 1974-75 funds." The proposed conclusions of law included the following: "4. The

decision of this court to grant a peremptory writ of mandate on June 30, 1975, and notification to counsel for petitioner and counsel for respondents was sufficient as a matter of law to preserve funds in the amount of $1,462,209.00 in the grade separation fund for allocation to the CITY OF SAN MARCOS in fiscal year 1974-75."

On July 11, 1975, respondents filed "Objection to Proposed Findings of Fact and Conclusions Of Law; Proposed Counter Findings and Conclusions; and Request for Special Findings." This instrument contains no objections to the recitals or conclusions of law which are quoted above. On July 15, 1975, respondents did, however, move to vacate the judgment on the grounds it was null and void in that the court and the court clerk lacked jurisdiction to enter a peremptory writ of mandate until findings of fact and conclusions of law were settled.

On August 25, 1975, the court denied respondents' motion to vacate, and signed, nunc pro tunc as of June 30, 1975, "Modifications And Additions Findings of Fact And Conclusions Of Law Heretofore Signed On June 30, 1975." This instrument includes the recitals and conclusions quoted above.

■ The respondents may not now attack the validity of the June 30 judgment because the record bears out the recitals in the findings signed August 25 to the effect that they waived the right to any procedural formalities which would delay entry of a binding judgment on June 30, or in the alternative, invited any error of the court on that account. Secondly, it is apparent that any error in the court's action was cured by the subsequent proceedings.

The petition was filed on June 17, 1975, one day after petitioner received a copy of a communication dated June 11, 1975, setting forth that the city failed to qualify for an allocation from the 1974-1975 Grade Separation Fund "by reason of failure to file a timely application." The filing was also but seven days after the Public Utilities Commission made an order relegating the city to a rank of 96 on the 1975-1976 priority list. The question of whether the city's petition should have been dismissed because of laches is discussed below (part II).

On June 27, 1975, a Friday, a hearing was held on a demurrer and answer filed by the respondents in return to the alternative writ issued when the petition was filed. At the inception of that hearing counsel for respondents advised the court that the parties were under a considerable

deadline because the list would expire on June 30, the following Monday. The chief, office of agreements and local assistance in the Division of Structures in the California Department of Transportation, who signed the communication of June 11, 1975 referred to above, advised the court that if he received a decision on July 1, 1975, that the city was entitled to an allocation, there would be no funds available, but that as of 5 o'clock, June 30, 1975, there would be $3,880,000 available. At the conclusion of the hearing, in response to the court's question, counsel for respondents indicated that any decision after June 30 would be moot, and counsel for petitioner affirmed that he believed a decision should be made before the end of the business day on June 30. The court inquired whether findings of fact and conclusions of law would be required if requested. Upon receiving an affirmative answer, he indicated that they could be waived, and counsel for respondents stated he would not waive them. In response to the court's questioning, counsel for respondents indicated that he wanted the court to grant the writ or discharge the alternative writ, and the judge said he would decide the matter, including ruling on the demurrer and the facts, if the demurrer were overruled, by Monday noon. In response to the court's suggestion that a telephone call be made concerning his decision, respondents' counsel stated, "It would be better than nothing," and that he thought respondents would have to have some knowledge if the writ were sustained.

At the hearing on the return day of the order to show cause re contempt, the attorney appearing for respondents pointed out that they wanted to appeal and that there could not be a proper appealable judgment until findings were settled. He stated, "Your Honor, after the Appellate Court makes determination on this matter, if they affirm your action, the money will be set aside—I mean, we are not saying we are going to defy any final court order, but our point is that we want to take the matter up on appeal." He acknowledged that if a ruling on June 30 was a requirement to prevent the surplus in the 1974-1975 fund from automatically going into the 1975-1976 fund, the ruling had been made in the proper fiscal year, and that the respondents would do whatever the appellate court said they had to do. The hearing on the contempt matter was continued to July 11, 1975. At that time the court advised counsel it considered itself in error in inviting amendments to the findings after the judgment had been filed and entered, and that the only way to attack his findings was by motion for new trial or appeal. After the court quashed the contempt proceedings, respondents' objections to its findings were nevertheless filed. They were again adverted to in connection with

respondents' motion for a new trial. Then respondents' counsel suggested that they should be adopted as the findings of fact and conclusions of law of the court.

The foregoing record demonstrates that it was contemplated that the court would make an order on or before June 30, which would be determinative of whether the sum sought by the city, and then available would be allowable to the city, or pass into the 1975-1976 Grade Separation Fund by operation of law. It is conceivable that in the absence of this understanding between the parties, the city might have sought some interlocutory relief which would have permitted earmarking the sum sought so that any final judgment in the action would not be rendered ineffectual by the mere passage of time. (See Code Civ. Proc., § 526, subd. 4 and § 1094.5, subd. (f).) It is unnecessary to pursue that theory. The subsequent conduct of the respondents does not reflect that they seriously questioned the right of the court to make a binding judgment concerning the 1974-1975 fund. Their concern was with having an appealable judgment predicated upon findings. As the trial court pointed out it did make findings. Insofar as the respondents waived the procedural requirements which are ordinarily a condition precedent to the entry of a judgment following trial by the court, they cannot complain at this stage of the case.

In *Hadley* v. *Superior Court, supra,* on which respondents rely, the matter quoted above is dicta, because as the court noted, "We need not determine whether findings of fact and conclusions of law were required in the proceeding below for administrative mandamus, because, even if such were required, it is apparent that petitioner has long since waived findings of fact and conclusions of law." (29 Cal.App.3d at p. 394.) In *International Assn. of Fire Fighters* v. *City of Palo Alto* (1963) 60 Cal.2d 295 [32 Cal.Rptr. 842, 384 P.2d 170], relied upon as establishing the principles quoted in *Hadley,* the matter was dictum because there was no factual issue before the court. The decision also states, "Moreover, it appears that formal findings were not required in the instant action. The trial court filed a written 'Memorandum Opinion,' setting forth the basis of its judgment. If there was any need to determine factual issues, that memorandum serves as informal findings." (60 Cal.2d at p. 300.) Finally, we note that in the second case relied upon in *Hadley, Delany* v. *Toomey* (1952) 111 Cal.App.2d 570 [245 P.2d 26], the appeal was dismissed "because taken from an order entered in the minutes upon the trial of issues of fact (not an order of nonsuit) made without findings of fact or waiver of findings." (111 Cal.App.2d at p. 571.) No judgment or findings at all were involved.

It is apparent that at the risk of losing jurisdiction over the fund, the court could have granted the respondents' motion to strike, considered the parties' suggestions concerning the findings, as it in fact did in connection with respondents' motion for a new trial, rendered the modified and additional findings which it actually signed on August 25, 1975, and then entered a second judgment. (See *Supple v. Luckenbach, supra,* 12 Cal.2d 319, 323; *Ohio Cas. Ins. Co. v. Northwestern Mut. Ins. Co., supra,* 17 Cal.App.3d 204, 207; and *Hulbert v. All Night and Day Bank, supra,* 29 Cal.App. 765, 767.) Here the court did not do so. If the respondents had immediately appealed from the judgment entered June 30, 1975, and refrained from participating in the motion for new trial and settlement of the findings attendant thereto, they would have taken the risk that the appellate court would decide, as we have, that under the circumstances they had waived their procedural rights to settlement of findings. On the other hand, the most they could have gained was a reversal with an opportunity to assert their rights to have findings settled and judgment signed in the manner provided by the code and rules. (See *McBride v. Alpha Realty Corp., supra,* 49 Cal.App.3d 925, 930; *Estate of Hewitt, supra,* 160 Cal.App.2d 584, 587-589; and *Petroleum Midway Co. v. Zahn, supra,* 62 Cal.App.2d 645, 651-652.) In the light of the record in this case it would be supererogation of the highest degree to reverse and remand the case to accomplish what already has been done. To paraphrase from *Petroleum Midway Co. v. Zahn, supra,* to conclude that we have no jurisdiction on this appeal to rule on the merits of the judgment entered on June 30, 1975, because the findings were ultimately settled after the entry of judgment "would be to give words precedence over the ideas they are meant to convey, and to give to a form of procedure greater obeisance than to the object sought to be attained." (62 Cal.App.2d at p. 652.)

Respondents' attack on the procedural aspects of the judgment is not meritorious on the record before us.

## II

In their answer respondents alleged, on information and belief, "that petitioner should have challenged the deadline of the Department on or around February 15, 1975, and by reason of said delay, are precluded from the relief sought by laches." Although requested to make a finding in accordance with those allegations by respondents' objections to the findings as originally filed by the court, the court failed to do so. Respondents contend that both the city manager and the engineer

employed by the city were aware of the February 15, 1975, deadline, when shortly prior to that date they submitted the city's application to the department, and that they then knew that the application did not contain an agreement with the railroad as required by the order of the Public Utilities Commission and the provisions of section 2456 of the Streets and Highways Code. Respondents assert that at that time the city should have launched its attack on the validity of the deadline. Prejudice is claimed because although the action filed June 17, 1975, was processed with dispatch, it was clear that a writ issued on June 30, 1975 would not give the department sufficient time to determine whether the application did contain "evidence satisfactory to the department that all necessary orders of the Public Utilities Commission have been executed, that sufficient local funds will be made available as the work of the project progresses, that all necessary agreements with affected railroad or railroads have been executed that, if required, all environmental impact reports have been prepared and approvals obtained, and that all other matters prerequisite to the award of the construction contract can be accomplished within one year after the allocation." (See Sts. & Hy. Code, § 2456.) Moreover, the delayed time period would not permit the commission to determine "at the time of allocation, that sufficient funds are available for all projects which are higher on the priority list and which are, or are reasonably expected to become, eligible during the fiscal year," as required by section 2460.[4]

■ "The defense of laches requires unreasonable delay *plus* either acquiescence in the act about which plaintiff complains, or prejudice to the defendant resulting from the delay." (*Conti* v. *Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 359 [82 Cal.Rptr. 337, 461 P.2d 617], italics added, fns. omitted. See also *Lerner* v. *Los Angeles City Board of Education* (1963) 59 Cal.2d 382, 399-400 [29 Cal.Rptr. 657, 380 P.2d 97]; *Cahill* v. *Superior Court* (1904) 145 Cal. 42, 46-49 [78 P. 467]; *People* v. *Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185,

---

[4]Section 2460 reads: "If more projects comply with the requirements of this chapter than can be financed from funds set aside for purposes of this chapter, allocations shall be made to those projects highest on the priority list established pursuant to Section 2452. The commission may make allocations for any project when it determines, at the time of allocation, that sufficient funds are available for all projects which are higher on the priority list and which are, or are reasonably expected to become, eligible during the fiscal year."

The question of the possible prejudice to the only other possible eligible applicant with a higher 1974-1975 priority is reviewed below (part VII). It was suggested that some entities with 1975-1976 priorities would be prejudiced if additional allocations were made for 1975-1976 and thereby reduced the funds carried over. Those applicants, of course, had no right to benefit in the event the department and the commission improperly carried out their duties in 1974-1975.

195-197 [119 Cal.Rptr. 266]; *Hadley* v. *Superior Court, supra,* 29 Cal.App.3d 389, 395-396; *Lewis* v. *Superior Court* (1968) 261 Cal.App.2d 736, 739-741 [68 Cal.Rptr. 631]; and *Dresser* v. *City of Torrance* (1956) 140 Cal.App.2d 42, 46-48 [294 P.2d 962]. Note also *Board of Education* v. *Common Council* (1900) 128 Cal. 369, 371-372 [60 P. 976].)

The respondents may have suffered some prejudice from the fact that the petition for relief was filed so late in the fiscal year. Nevertheless, the record supports the court's findings, insofar as they are inconsistent with the establishment of the defense of laches and tend to establish that there was neither any unreasonable delay in bringing the action, nor any acquiescence by the city in the proposition that the application should not be considered at all because no agreement with the railroad had been filed on or before February 15, 1975. The pertinent evidence and findings reflect the following.

On February 13, 1974, the Public Utilities Commission initiated proceedings to establish priorities for allocations from the grade separation fund for the fiscal year 1974-1975. (See Sts. & Hy. Code, § 2452, fn. 1 above.) According to officials of the Department of Transportation who testified at the trial, it was publicly announced at the commission's hearings that applications from those with high priorities would have to be received by the department by February 15, 1975,[5] in order for the applicant to be eligible for an allocation. The city manager of the petitioner could not recall that any such statement was made. The engineer, who had been employed by the city in December 1973 to assist with the planning of the work and the applications for priority and for an allocation, acknowledged that through his work for various local agencies he knew that the department had set a date by which all of the documents necessary to establish the statutory requisites were supposed to be transmitted to the department. According to the engineer there were occasions on which the department had indicated a willingness to waive a deadline. The record showed that an application of lesser priority might receive consideration if a qualifying entity with greater priority withdrew its application. The department officials who testified adamantly denied that funds had ever been allocated to one who failed to complete the application by the deadline. The court found, "There was evidence that the Department of Transportation had in the past indicated its intention to waive the administrative deadline for submitting applications."

---

[5]The origin and manner of adoption of this requirement are traced in part III below.

On June 25, 1974, the Public Utilities Commission made its order establishing priority for the 1974-1975 fiscal year. So far as is material here, the application of the petitioning city was assigned a priority number of 23 and that of Los Angeles County for a grade crossing at Hollywood Way, a priority of 21. On July 3, 1974, the department sent a copy of the priority list to all of its district headquarters and advised local agencies of the priority list and requested them to file an application by February 15, 1975. On July 17, 1974, a letter was mailed to the city manager from the district director of transportation. It referred to the priority list which had been established and the city's intention to submit an application. It stated: "This must be done before February 15, 1975, and should be processed through this office. [¶] Attached is a list of items which should be incorporated into your submittal." The list included seven items the second of which read, "Fully-executed Agreement between the Local Agency and the railroad." The city manager could not locate the letter in the city files, but he acknowledged that he had received a similar letter in 1973, and might have received the 1974 letter and sent it on to the engineer.

On October 21, 1974, the city filed an application with the Public Utilities Commission to construct the grade crossing. This application was granted December 30, 1974. The order provided in part, "Construction and maintenance costs shall be borne in accordance with an agreement to be entered into between the parties relative thereto and a copy of said agreement, together with plans of said crossing approved by The Atchison, Topeka and Santa Fe Railway Company shall be filed with the Commission prior to commencing construction. Should the parties fail to agree, the Commission will apportion the cost of construction and maintenance by further order."

The negotiation of an agreement with the Santa Fe Railroad was entrusted to the engineer retained by the city. The engineer testified he discussed the substantive issues of the extent of the project with which the railroad would participate with the railroad and settled them, and that the agreement in general was similar to other agreements with that railroad. He traced the delays inherent in dealings between a railroad with headquarters in Chicago and a local municipality. He estimated that from 9 months to 65 weeks would be necessary to secure an executed agreement. Other testimony indicated that a railroad, with knowledge of the department's deadline, might stall to prevent a project from going forward. According to the city manager the agreement was drafted in its final form in January 1975. After it was approved by the city manager it

was returned to the railroad's local agent for delivery to its Chicago head office. Despite urging from the city manager, the agreement was not returned until April 1975. Then, after approval and execution by the city council, it was delivered to the department.

Meanwhile, at the suggestion of a local representative of the department, the city filed its application with the district office. At that time the city manager was not aware that the deadline would be applied so rigidly. There were no unresolved problems concerning the agreement other than its execution, and he believed that the city would be eligible if sufficient funds were available. The court found, "4. Between February 5-7, 1975, the City of San Marcos submitted its application to District 11 (San Diego), Department of Transportation, which included the following documents: [¶] (a) PUC order dated December 30, 1974 and Decision No. 83886 authorizing construction of the grade crossing for which application for an allocation was sought; [¶] (b) certified copy of Resolution No. 75-1005 of the City of San Marcos evidencing a commitment of local funds for the project; [¶] (c) environmental impact report for the project; [¶] (d) a detailed estimate of project work; [¶] (e) a simplified plan, with drawings, of the project. [¶] The railroad agreement was not submitted; it was at that time under review by officials of the affected railway, Santa Fe, at their home office in Chicago. The letter of submittal, dated February 5, 1975, contained the statement, 'The Railroad agreement is being processed by the Santa Fe Railway Company officials. They have had it several months. Mr. Gilmore of their staff supports this project.' "

Apparently the application was held at the district headquarters and was not forwarded to the head office of the department. The papers filed were not returned to the city because they were incomplete, and neither the city nor its responsible employees were advised that the application was not being considered. There was, therefore, no reason for the city to take action at that time. In fact the court found on uncontradicted evidence, "14. On May 1, 1975, the CITY OF SAN MARCOS delivered the executed Railroad Agreement to Mr. Jake Dekema, District Engineer, District 11, California Department of Transportation. By memorandum dated May 2, 1975, Mr. Dekema recommended that an allocation be made to the CITY OF SAN MARCOS stating that: 'As you are aware, it is difficult to negotiate with the railroads, and because the City of San Marcos sent in all of the necessary documentation with the exception of the signed Railroad Agreement prior to the deadline date of February 15, 1975, I strongly recommend that this project be approved and that

the City be granted an allocation of $1,462,209.00 from Fiscal 1974-75 Grade Separation Fund.' "

Apparently when the application was received in Sacramento it was reviewed by the chief of the office of agreements and local assistance in the Division of Structures in the California Department of Transportation, an individual who spent half of his time assisting cities and counties and the other half on state projects of similar nature. On May 9, 1975, he recommended against giving the city an allocation. He acknowledged that no formal letter denying the application was sent to the city at any time prior to a communication dated June 11, 1975, to the district director who had forwarded the application.[6] The witness testified he had advised the city manager of the rejection when he was in Sacramento on other business. The witness acknowledged that he did not send the city a letter at that time because he "wanted to make doubly sure." Although the city manager testified that the meeting was on May 20, 1975, the conversation he related occurred prior to the time the agreement was submitted, because he was left with the impression that the agreement should be forwarded for review of the whole application, even though it were doubtful it could be approved if not complete by February 15.

The department's witness testified he advised the city's retained engineer of the rejection of the application in a telephone conversation initiated by the engineer around the first of June, about three weeks prior to the court hearing on June 27, 1975. At that time the engineer apparently knew the application would not be considered, and the witness told him it was unfortunate he had not gone to Chicago to secure earlier execution of the agreement. According to the engineer, he called the department on another matter around the first week in June, and was advised the department was rejecting the application. He acknowledged he was not surprised because he had observed past rigid, inflexible adherence to deadlines on the part of the department, but he had also witnessed occasions when it had indicated a willingness to waive the deadline.

---

[6]This communication reads: "The City of San Marcos' application for an allocation from the 1974-75 Grade Separation Fund was received in incomplete form as of February 15, 1975. The application did not contain an executed agreement between the City and The Atchison, Topeka and Santa Fe Railway Company. [¶] Under California Department of Transportation and California Highway Commission rules, to qualify for a 1974-75 Grade Separation Fund allocation, an application complete in all the customary requirements in Section 2456 of the Streets and Highways Code must be filed with the State on or before February 15, 1975. [¶] The City of San Marcos fails to qualify for an allocation from the 1974-75 Grade Separation Fund by reason of failure to file a timely application."

On June 10, 1975, the Public Utilities Commission made its order setting the priorities for the fiscal year 1975-1976. In this order the commission established new criteria for weighing priorities. Because "readiness" was relegated to a more subordinate position the city dropped from 23 to 96 in rank.

On June 16, 1975, the petition was verified by the city's attorney. On the same day the city received a copy of the June 11, 1975, notice of rejection (see fn. 6 above). The petition was filed June 17, 1975, and by amendment filed June 19 the written rejection was incorporated in the petition.

The court made further findings which bear on the issue of laches. They are as follows:

"16. The DEPARTMENT OF TRANSPORTATION treats the receipt by one of its district offices of an application submitted by a municipality as receipt by the DEPARTMENT OF TRANSPORTATION."

"21. The engineering aspects of the San Marcos project were available for review by the DEPARTMENT OF TRANSPORTATION prior to the administrative deadline of February 15, 1975."

"12. The delayed delivery of the railroad agreement was not the fault of the City of San Marcos but rather it was the fault of the Santa Fe Railroad."

"13. Neither the State of California nor any other applicant to the 1974-75 Great [sic] Separation Fund was in any way prejudiced by the May 1, 1975 submission of the signed railroad agreement with the Department of Transportation."

"6. As of May 1, 1975 the City of San Marcos was in full compliance with the requirements for receipt of an allocation under Section 2456."

"22. The review by the state of standard railroad agreements of the type entered into between San Marcos and the Santa Fe Railway Company is not time-consuming and in no case requires four and one-half months."

The foregoing findings are, with the possible exception of number "6" which is reviewed below (part V) insofar as it involves a conclusion of law, sustained by the evidence.

There may be some merit to the respondents' claim that the city was prepared to accept a rejection and take its chances on a 1975-1976 allocation until it learned that its priority had dropped from 23 to 96. That analysis confuses the city's motive in filing, with the city's right to delay taking action. It was obvious that since the district office invited and received the application, subsequently rejected as inadequate, there was no burden on the city to take action until advised of a rejection. When the papers were forwarded with a favorable recommendation after the receipt of the railroad agreement, the city could do nothing but await further word. The record fails to show that any definitive rejection was communicated in any form until a week or so before the petition was filed. Under those circumstances we conclude that the respondents failed to prove the defense of laches, and the trial court did not err in failing to make the findings requested by them. If there has been prejudice by the delay, it was occasioned by the respondents' failure to reject the application at the time it was filed.

## III

■ As outlined above the department relied upon oral announcements at the hearings of the Public Utilities Commission, internal communication to its district offices and letters to prospective applicants as establishing that any application had to be validly and correctly completed by February 15, 1975, in order to receive consideration. Testimony at the hearing and the records filed in the case reveals the following:

Back in 1958 the department (then the Department of Public Works) had a comprehensive instruction called "G. G. McCoy's Instruction" which was disseminated to the 11 district offices. It was modified from time to time and in order to determine the current instructions it would be necessary to go through the files and come up with a series of instructions or requests.

On February 15, 1973, the California Highway Commission adopted its resolution "M-90" for the purpose of delegating its ministerial and administrative functions relative to the administration of the grade separation program to the Director of Public Works (now Director of Transportation). The resolution authorized the director to apportion funds from the Grade Separation Fund among separation of grade districts and local agencies in accordance with the applicable annual priority list established by the Public Utilities Commission pursuant to sections

190-191 of the Streets and Highways Code, and subject to terms and conditions similar to those now found in sections 2456 and 2457. The resolution expressly provided: "4. That in order for a local jurisdiction to be eligible for an original apportionment from the funds available in the Grade Separation Fund a valid and correct application must be received in a Division of Highways Office, Headquarters Office, or Office of the Director of Public Works by August 15 of the year affected by the Priority List;" and "[¶] 5. That the Director of Public Works shall make apportionments, insofar as funds are available, to all new projects for which valid and correct applications are received by the August 15 deadline in order of priority established by the Public Utilities Commission."

On June 6, 1975, the Director of Transportation proposed that the foregoing resolution be superseded by a resolution which would update the policy to conform to recent legislative changes, and to simplify the original resolution, which included excerpts of the statutes governing the fund. The summary and conclusion approved by the director stated, "The major change in the statutes was that the Public Utilities Commission shall establish a priority list for projects on July 1 instead of January 1, starting in 1974. This means that the date that applications must be received from local agencies must also change to reflect this. The final filing date for an original allocation will now be February 15 instead of August 15. . . ." This resolution "M-136" was passed by the commission on June 18, 1975, after the present action was commenced. It rescinded resolution "M-90" but did not itself establish a cut off date for applications. It reads in pertinent part, ". . . the Director of Transportation is hereby authorized to administer the Grade Separation Program and to make apportionments from the fund in conformance with said statutes, including setting reasonable dates for applications for original and supplemental allocations and making allocations to qualifying candidates in conformance with current statutes."

The trial court made the following findings of fact:

"17. The procedure by which the DEPARTMENT OF TRANSPORTATION administers the grade separation fund established under Streets & Highways Code §§ 190, 2453 and 2456, is not published in the California Administrative Code.

"18. The February 15 deadline established by the DEPARTMENT OF TRANSPORTATION for the timely filing of applications for grade separa-

tion fund allocations is not published in any rules or regulations passed and disseminated to the public by the DEPARTMENT OF TRANSPORTATION.

"19. The procedure governing the administration of the grade separation fund accepted by the DEPARTMENT OF TRANSPORTATION as being in effect on February 15, 1975, and continuing in effect through approximately June 6, 1975, is set forth in California Highway Commission Resolution No. M-90. Said Resolution No. M-90 establishes a deadline of August 15 for the submission of applications for grade separation allocations and does not mention a deadline of February 15."

It concluded: "3. In the absence of a regulation enacted pursuant to the California Administrative Procedure Act, setting forth a review procedure for applications to the grade separation fund, the enforcement of a February 15 application submission deadline is unreasonable, arbitrary and invalid."

It was acknowledged by all concerned that the department, in carrying out its responsibilities under sections 2456 and 2457, and the authority to make allocations under section 2453 as delegated to it by the commission, necessarily needed some period of time within which to review the application of any entity seeking an allocation in order to determine whether it had complied with the statutory conditions for the assertion of its priority. Moreover, it is clear that the department had the implied power to adopt reasonable rules and regulations necessary for the efficient administration and exercise of the express power to review those applications. (See *Dickey* v. *Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 810 [151 P.2d 505, 157 A.L.R. 324]; *Cal. Drive-In Restaurant Assn.* v. *Clark* (1943) 22 Cal.2d 287, 303 [140 P.2d 657, 147 A.L.R. 1028]; *Bank of Italy* v. *Johnson* (1926) 200 Cal. 1, 20 [251 P. 784]; and *Leftridge* v. *City of Sacramento* (1943) 59 Cal.App.2d 516, 523-524 [139 P.2d 112].) The question is whether the regulation asserted falls within the purview of the Administrative Procedure Act (Gov. Code, tit. 2, div. 3, pt. 1, chs. 4, 4.5 and 5, particularly ch. 4.5, §§ 11371-11445 dealing with rules and regulations of state agencies).

Subdivision (b) of section 11371 provides in relevant part, that for the purpose of the statute, " 'Regulation' means every rule, regulation, order, or standard of general application or the amendment, supplement or revision of any such rule, regulation, order or standard adopted by any state agency to implement, interpret, or make specific the law enforced

or administered by it, or to govern its procedure, except one which relates only to the internal management of the state agencies. . . ." It is obvious that the requirement in the 1973 resolution fixing a deadline for the receipt of "a valid and correct application," as modified by letter to February 15, 1975, and the accompanying list of the minimum documents that must be included in a local agency's application, are standards which the commission and the department purported to adopt to implement the provisions of section 2456 of the Streets and Highways Code (see fn. 1 above), which the Legislature entrusted to the department to administer, and, as well, to govern the procedure to be followed by the department in making the mandated review. They therefore would come within those provisions of the act which govern when a regulation will become effective (§ 11422), the manner of giving notice of the proposed adoption of the regulation (§ 11423), the matter to be included in the notice (§ 11424), the opportunity for interested persons to be heard with respect to the proposed regulation (§ 11425), and filing and publication of the regulation (§§ 11380-11385 and §§ 11409-11415).

In reliance upon our opinion in *Hubbs* v. *People* ex rel. *Dept. Pub. Wks.* (1974) 36 Cal.App.3d 1005 [112 Cal.Rptr. 172], respondents assert that the rules in question are not subject to the act because they do not fall within the provisions of section 11420 which read, ". . . Except as provided in Section 11421 [which refer to certain exclusions, discussed below], the provisions of this article are applicable to the exercise of any quasi-legislative power conferred by any statute . . ." In *Hubbs* we held that the power conferred on the department (then the Department of Public Works) to lease property acquired for future state highway needs, did not carry with it the power or duty to make rules and regulations having the force of law. We concluded, "With respect to defendant, it is not required to perform duties as a landlord additional to those required of private landlords. Accordingly, neither it nor the department, as its agent, was required to enact rules and regulations for the conduct of the landlord-tenant relationship here involved." (36 Cal.App.3d at p. 1009.) Here on the other hand, the department had to make provision for ways and means of carrying out the review required by the legislative purpose embodied in the statute, a function we recognized as legislative in character in *Hubbs* (see 36 Cal.App.3d at p. 1008). In fact recognition and insistence on the department's right to create a deadline and prescribe the material to be furnished demonstrates the quasi-legislative nature of the rules.

Respondents contend that the requirement is merely a rule or standard "which relates only to the internal management" of the department as

excluded by the last clause quoted above from subdivision (b) of section 11371. It further may be noted that prior to 1949 the exception read, "except one which relates only to the *organization or* internal management of the state *agency.*" (See former Pol. Code, § 720, as added Stats. 1941, ch. 628, § 1, p. 2087, italics added; former Gov. Code, § 11380, as added by Stats. 1945, ch. 111, § 3, p. 445; and Stats. 1947, ch. 1425, § 1, p. 2985. Cf. Stats. 1949, ch. 313, § 1, p. 600.) In 1949 subdivision (a) was added to section 11421 to provide: "The provisions of this article shall not apply to any regulation not required to be filed with the Secretary of State under this chapter, and only this section and Section 11422 of this article shall apply to any regulation prescribing an agency's organization or procedure or to an emergency regulation adopted pursuant to subdivision (b) of this section." (Stats. 1949, ch. 313, § 4, p. 601.)

In *Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317 [253 P.2d 659], the petitioner attacked several resolutions adopted by the respondent in connection with the construction and financing of a toll bridge on the ground that they were "regulations" within the Administrative Procedure Act and unlawful because not adopted in compliance with the provisions of that act (40 Cal.2d at pp. 321-324). The court found that the resolutions did not fall within the definition of regulations contained in section 11371 of the act because "they were adopted for particular application to the subject of either approving or disapproving, under the provisions of the California Toll Bridge Authority Act (Sts. & Hy. Code, § 30000 et seq.), the recommendation of the Department of Public Works that the bridge be constructed, and of authorizing the issuance of revenue bonds following approval of such recommendation (Sts. & Hy. Code, § 30200)." (*Id.,* p. 323, fn. omitted.) The court rejected the contention that the resolution affected the public generally, and stated, ". . . inasmuch as the 'application' so urged by plaintiffs relates to only one particular bridge, and solely to the specific project described, and as the resolutions (as alleged) do not purport to treat generally with, for instance, all bridges or all toll bridges or any open class under the jurisdiction of the authority, we are satisfied that plaintiff's position in this respect is without merit." (*Id.,* pp. 323-324.) It added, "Furthermore, it appears that the pertinent resolutions are not calculated or effective to 'implement, interpret, or make specific the law enforced or administered by' the authority (§ 11371), but rather that they were adopted in the course of compliance with the statutory mandate that the authority act, one way or the other, upon the recommendation of the Department of Public Works that the bridge be constructed (Sts. & Hy. Code, § 30200). In other words, the resolutions constituted steps in the performance of a

statutory duty, rather than acts which would 'implement, interpret, or make specific the law.' " (*Id.,* p. 324. See also *City of San Joaquin* v. *State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374-375 [88 Cal.Rptr. 12].)

In *Faulkner* the governing authority was concerned with exercising its statutory powers in connection with one project. Here, on the other hand, the department is charged with the duty of reviewing not only its own projects, but those submitted by local agencies throughout the state. The form and manner in which applications for funds, to be allocated by the department under the authority delegated by the commission, are to be processed is a matter of concern to every local entity within the state in which there are railroad crossings. The issue is governed by *Poschman* v. *Dumke* (1973) 31 Cal.App.3d 932 [107 Cal.Rptr. 596], where the court stated: "Appellant contends that this regulation is invalid because the notice and hearing requirements therein [citation] were not complied with. The record so shows. Respondents contend that these requirements do not apply because the regulation related only to the internal management of a state agency, thus falling within the exception of Government Code section 11371, subdivision (b). For this proposition, respondents rely on several New York decisions which are not applicable herein because (a) the New York exception is broader [citation]; (b) no New York decision involves a teacher's grievance procedure created under statutes similar to the California Education Code [citations]; and (c) because the better reasoned view is to regard the 'internal management' narrowly so as to encompass accounting techniques and the like. (See *City of San Joaquin* v. *State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 375 . . .) Tenure within any school system is a matter of serious consequence involving an important public interest. The consequences are not solely confined to school administration or affect only the academic community." (31 Cal.App.3d at pp. 942-943.) Respondents have confused the internal rules which may govern the department's procedure in developing its applications for funds for its own projected grade crossings, and the rules necessary to properly consider the interests of all who will seek consideration under the provisions of the statutes dealing with review and allocations.

Although not raised by the respondents, we recognize that subdivision (a) of section 11421 of the act, as quoted above, excludes "any regulations not required to be filed with the Secretary of State under this chapter." Paragraph (3) of subdivision (a) of section 11380 excludes from that requirement any regulation which "Is directed to a specifically named person or to a group of persons and does not apply generally throughout the State." (See *American Friends Service Committee* v.

*Procunier* (1973) 33 Cal.App.3d 252, 259-261 [109 Cal.Rptr. 22].) In the cited case the court examined the general objectives and manifest purposes of the Administrative Procedure Act and concluded, "We observe the basic purposes of APA to be two-fold, namely, to provide in the context of a multi-agency control and supervision over widely varied business and professional enterprises and activities a standard and uniform procedure whereby those affected by the controls may be heard; and second, to provide a repository accessible to the public in which general administrative rules and regulations may be found, thus avoiding secrecy." (33 Cal.App.3d at pp. 261-262.) After examination of other applicable provisions of law it concluded, with respect to the rules and regulations of the Department of Corrections, its director, and the Adult Authority, "Since the purposes of APA are fulfilled by other and independent provisions of law, it may reasonably be inferred that the Legislature did not intend to superimpose separate and unnecessary statutory procedures designed to meet the same purposes and objectives. [¶] We conclude from the foregoing that defendants' rules and regulations are embraced within the exception defined by Government Code section 11380, subdivision (a)(3), and are thus beyond the purview of APA." (*Id.,* p. 262.)

In this case on the other hand, although there has been an attempt to furnish applicants with notice of the deadline and advice as to the materials required, there is no statute or official regulation so providing. Nor does it appear that those rules and practices which have evolved in connection with reviewing and making allocations among applicants for grade separation funds have been assembled in a repository accessible to the public. More importantly, it does not appear that the affected local agencies have had an opportunity to participate in the formulation of the rules. They should not be relegated to the status of prisoners and parolees subject to the control of those responsible for their custody. The existence of this controversy, involving in part as it does (see part IV below) the reasonableness of the action taken by the department, and the fact that six cities have filed a brief as amici curiae in support of the petitioning city's position indicate that there is some necessity for standards in which those affected have a voice. Finally, despite the fact that the record reveals naught to impeach the integrity of the department and its responsible officials, the fact remains that the department which reviews the applications is competing with the local agencies for grade separation funds.[7] In *Bayside Timber Co.* v. *Board of Supervisors* (1971)

---

[7]The department nominated 13 projects with an aggregated estimated cost of $26,505,000 for priority rating for the fiscal year 1974-1975. Three of these projects

20 Cal.App.3d 1 [97 Cal.Rptr. 431], we struck down the Forest Practice Act (Pub. Resources Code, §§ 4521-4618) because the Legislature had delegated to timber owners and operators the exclusive power to formulate forest practice rules without adequate guides or standards. Here the department has been furnished with substantive standards in the statute (see part VI below), but its procedural rules are questioned. There we pointed out, "When legislative authority without standards for its guidance is delegated to an agency or group of individuals with a pecuniary interest in its subject matter, the constitutional fault is compounded." (20 Cal.App.3d at p. 12. See also *State Board* v. *Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436, 448-449 [254 P.2d 29].) The rationale of the cases last cited confirms our conclusion that the procedural rules of the department in administering allocations from the grade separation fund should be adopted as provided in the Administrative Procedure Act.

Since the deadline was not so adopted it cannot be considered as a valid regulation. The consequences are discussed below.

IV

In addition to the findings which have been set forth above, the court found: "20. The series of steps involved in the preliminary engineering, review, negotiating and processing of an agreement between an out-of-state railroad and a small municipality such as San Marcos requires an extensive period of time which cannot reasonably be accomplished in seven and one-half months."

It also concluded, "2. The adherence to the February 15, departmental deadline for the allocation requirements, as it specifically pertains to CITY OF SAN MARCOS application, in the unique circumstances of this case, is an abuse of discretion by respondents. In this specific case, it is an enforcement of a rule which thwarts and nullifies the safety program of the grade separation program. Under the factual setting of this case it is

---

totaling $10,840,000 were rated in the first 18 of 69 shown to be rated. Two projects, rated 4 and 18 respectively, were either not pressed by an application or were withdrawn. One project, rated 14, and estimated to cost $3,535,000 was included in the $15,921,461 allocated by the department.

The department nominated 16 projects with an aggregate estimated cost of $64,396,000 for priority rating for the fiscal year 1975-1976. Thirteen of these were rated as new construction, and three were rated for alteration or reconstruction. All of these projects were included among the 105 rated. Four, totaling $18,517,000, received a priority rating within the first 20, respectively 2, 9, 17 and 20.

an arbitrary application and conflicts with the legislative intent of (1) making funds available to eligible smaller local agencies, and (2) preventing the accumulation of funds from one fiscal year to another"; and "5. Although some kind of administrative deadline for submitting applications is desirable and even necessary, it is unreasonable to apportion seven and one-half months for the preparation of an application by a municipality and four and one-half months for state review. Such a protracted period of review conflicts with the purposes of the grade separation program to serve municipalities rather than the convenience of administrators of said program."

■ Respondents attack the foregoing conclusions and the findings of fact on which they are based. They point to testimony given by officials of the department which reflects that in conducting the review directed by section 2456 the department verifies that the local agency has the necessary order from the Public Utilities Commission authorizing construction. It must be satisfied that sufficient local funds will be available to carry out the project. It reviews the plans and engineering data and the estimate of the cost of the project to be sure that the estimated cost is reasonable for the construction proposed, that the estimated cost does not include work which is not compensable from the grade separation fund, and that the railroad is not receiving benefits which would in effect reduce its agreed or ordered contribution below the 10 percent required by law. (See Pub. Util. Code, § 1202.5.) It ascertains that any required environmental impact reports have been prepared and approved. Legal counsel review the agreement with the railroad, where one is required, to insure that the requisite contribution is to be made by the railroad, and generally complies with the statutory provisions governing grade crossings.

At the outset of the trial the court acknowledged, "I am satisfied that there is a lot of work to be done, four and a half months is required, and things of that nature, but what I want to know is, What are these railroad agreements? . . . Were there any other deficiencies in the San Marcos application other than not having the railroad agreement by February 15th?—things of that nature is what we are concerned with today." Although respondents seize on this remark as establishing that four and one-half months was considered reasonable for a cut off date to give the department time for review, when the remarks are read in context it is apparent that the court was attempting to delineate the issues. The department's bridge agreements engineer testified that on the basis of a study of 64 projects reviewed during the period from 1968 through 1974,

it was determined that 34 percent took 4 or more months, and that 48 percent, involving simple grade crossings, were reviewed in a month's space of time. His testimony revealed that the review process was not the major function of the office, which was also involved with the state department's own plans for grade crossings on state highways and applications for funds from the grade separation fund for such projects. He estimated that less than 25 percent of the time was spent on the review process. The attorney for the department testified that legal review of the project, including any agreement, might take from one day to two weeks.

The witnesses for the state acknowledged that an agreement with an out-of-state railroad, such as the Santa Fe, which was involved here, would generally take longer to negotiate than one with a locally based railroad, at least insofar as securing formal approval, after the engineers had reached agreement on the substance of the construction to be embraced. The city's engineer produced a schedule which showed that it would generally take between 8½ and 13 months to secure an executed agreement between a local agency and an out-of-state railroad. In his opinion, if a local agency started to secure an agreement in July when the priorities became known, it would not be humanly possible to accomplish all the steps to get the agreement back in the 7½ months allowed by the department. In his opinion it would be a logical solution to have a more flexible provision such as a two-stage procedure where the engineering and financial data would be filed for review at one point and later be supplemented by the executed agreement. He pointed out that smaller cities and counties were handicapped because they do not have the personnel to camp on the railroad's doorstep and secure prompt review of forms of agreement that may be submitted, whereas the state and large local agencies could do so.

The evidence sustains the court's finding and the trial court could well conclude from the foregoing evidence that the procedure followed by the department was unreasonable, arbitrary and invalid. Respondents, however, contend that the trial court abused its power in so concluding, and further in concluding that the rule imposed by respondent was inconsistent with the legislative program as embodied in the relevant statutes.[8] They rely on the general principle that the court's function in

[8]Section 1, of chapter 1153, Statutes of 1973, which inserted the chapter on grade separation projects in the Streets and Highways Code (see fns. 1 and 2 above), reads as follows:

"The Legislature hereby finds and declares that:

"(a) Concern for public safety and convenience makes it desirable that an expanded program be undertaken that places the highest priority on eliminating the most

passing upon the efficacy of the means employed by the agency to effectuate the statutory purpose is a limited one, and a court should not superimpose its own policy judgment on the agency in the absence of an arbitrary and capricious decision. (*Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 179 [70 Cal.Rptr. 407, 444 P.2d 79]. See also *Faulkner* v. *Cal. Toll Bridge Authority, supra,* 40 Cal.2d 317, 329; *Lindell Co.* v. *Board of Permit Appeals* (1943) 23 Cal.2d 303, 315 and 319 [144 P.2d 4]; and *Bank of Italy* v. *Johnson, supra,* 200 Cal. 1, 32-33.) ▇ The limitations on this principle were expressed and applied in *Morris* v. *Williams* (1967) 67 Cal.2d 733 [63 Cal.Rptr. 689, 433 P.2d 697], where the court struck down regulations which were inconsistent with the purpose of the Medi-Cal program. The court stated, "Our function is to inquire into the legality of the regulations, not their wisdom. Nor do we superimpose upon the agency any policy judgments of our own. Administrative regulations that violate acts of the Legislature are void and no protestations that they are merely an exercise of administrative discretion can sanctify them. They must conform to the legislative will if we are to preserve an orderly system of government." (67 Cal.2d at p. 737.)

▇ The latter principle is embodied in the provisions of the Administrative Procedure Act, which as we have seen, is applicable to the procedural rule applied by the respondents in this case. Government Code section 11374 states, "Whenever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate

---

hazardous railroad-highway grade crossings that continue to take the lives of the people of this state.

"(b) Previous programs designed to accomplish the removal of hazardous grade crossings in this state have proven to be inadequate for the following reasons:

"(1) A disproportionate amount of the total funds made available for such projects has been used by the larger local governmental agencies, while smaller local agencies have not been able to accumulate the local matching funds required to take advantage of the program.

"(2) Preexisting law did not permit the use of such funds to eliminate equally serious and hazardous grade crossings along conventional state highways.

"(3) Preexisting law required the imposition of cumbersome administrative procedures which discouraged many of the state's smaller local agencies from taking advantage of the program.

"(c) The prior methods used to develop the construction priority list for these projects too often fail to identify the most hazardous crossing locations because inordinate emphasis is given to those projects which can be readily funded by the local agency.

"(d) Because of the defects in the preexisting law, approximately twenty-five million dollars ($25,000,000) has accumulated in the fund set aside by the Legislature to carry out this essential program for the removal of hazardous grade crossings."

the purpose of the statute. [¶] Any existing rules or regulations conflicting with this section are hereby repealed." (See *Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 815-816 [114 Cal.Rptr. 577, 523 P.2d 617]; *Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 679-681 [94 Cal.Rptr. 279, 483 P.2d 1231]; *Rosas* v. *Montgomery* (1970) 10 Cal.App.3d 77, 87-88 [88 Cal.Rptr. 907, 43 A.L.R.3d 537]; and *Renken* v. *Compton City School Dist.* (1962) 207 Cal.App.2d 106, 114 [24 Cal.Rptr. 347].)

We find that the conclusion of the court that the rule applied by respondents conflicted with the legislative intent that funds should be made available to eligible smaller agencies and should not be accumulated from year to year is sustained by the record in this case. We also note that the Legislature was dissatisfied with "cumbersome administrative procedure which discouraged many of the state's smaller local agencies from taking advantage of the program." (See fn. 8 above.)

Having concluded that the rule applied to foreclose the city's application was invalid because it was not adopted in accordance with the provisions of the Administrative Procedure Act, and was inconsistent with the purposes of the statute, we turn to examination of the relief granted the city by the judgment of the trial court.

V

As noted above the court found: "6. As of May 1, 1975 the City of San Marcos was in full compliance with the requirements for receipt of an allocation under Section 2456."

The conclusions recite, "1. There was sufficiency of compliance by the CITY OF SAN MARCOS with § 2456 of the California Streets & Highways Code for it to receive its allocation of funds."[9]

Respondents assert that there can be no substantial compliance with the requirements of section 2456. "A court should not insert qualifying provisions into the language of a statute where such a

---

[9]The modified and additional findings signed and filed after consideration of the respondents' motions and objections to the original findings modified paragraph "4" of the original findings, which referred to the application submitted in February, so that it reads as found in part II above, by deleting the following at the end of the paragraph, "There was sufficiency of compliance by the City of San Marcos with Section 2456 of the California Streets and Highways Code for it to receive its allocation of funds." This matter was then inserted in the conclusions of law.

construction is not plainly required in order to carry out legislative intent. (*Vallerga* v. *Dept. of Alcoholic Bev. Control* (1959) 53 Cal.2d 313, 318 . . . )" (*Cryor* v. *State Personnel Bd.* (1967) 253 Cal.App.2d 100, 104 [61 Cal.Rptr. 243]. See. also *Anderson* v. *I. M. Jameson Corp.* (1936) 7 Cal.2d 60, 66 [59 P.2d 962]; and *People* v. *Gustafson* (1942) 53 Cal.App.2d 230, 239 [127 P.2d 627].) The statute, however, does not fix the deadline for filing a completed application. The court's finding of fact is sustained by the evidence. The court had also found that in February the city had furnished the department with a copy of the Public Utilities Commission order authorizing the project, a certified copy of action taken by the city to commit requisite local funds for the project, an environmental impact report, a detailed estimate of the project work, and a simplified plan with drawings of the project. The Public Utilities Commission order included among other conditions, "6. Construction and maintenance costs shall be borne in accordance with an agreement to be entered into between the parties relative thereto and a copy of said agreement, together with plans of said crossing approved by The Atchison, Topeka and Santa Fe Railway Company shall be filed with the Commission *prior to commencing* construction. Should the parties fail to agree, the Commission will apportion the cost of construction and maintenance by further order." (Italics added.)

It is not seriously contended that the application was not in full compliance with the requirements of section 2456, except with respect to satisfactory evidence "that all necessary agreements with affected railroad have been executed." The application did indicate that such an agreement would be forthcoming, and it was, and was furnished to the department on May 1, 1975. In the absence of a valid rule or regulation, the acceptance of the application in the form in which it was tendered, without any notice of rejection, evidenced that the application was in sufficient compliance on February 7, 1975 when it was filed, and the filing of the agreement on May 1, 1975, constituted full compliance.

The situation is analogous to that found in *Oddo* v. *Hedde* (1950) 101 Cal.App.2d 375 [225 P.2d 929]. There the owners sought to avoid their obligation to a contractor on the ground that he had performed the work without a proper license. The record showed that the contractor had applied for a general contractor's license in February 1946, and had been issued a general engineering license which he believed entitled him to contract as a general building contractor. Thereafter, in July 1947, the licensing board adopted rules classifying the contracting business so that he was ineligible to act as a general contractor. In November 1947,

without knowledge of the rules, he did so contract. When the contractor received the published notice of the new rules in February 1948 he applied for, and in March received, the necessary supplement to his license to qualify as a general building contractor. The court pointed out, "At the times he filed his application in 1946 and for its renewal in 1947, if rules 730 and 731 and 760 had been adopted by the board, it was incumbent upon the registrar to advise licensees who might be affected thereby. In the modern state with all the regulations of man's activities, from the cradle to the grave, it is unthinkable that every individual of a group governed by an administrative board can have knowledge of every rule adopted for the regulation of members." (101 Cal.App.2d at p. 381.) So here if the department were insisting on strict compliance with the deadline with respect to the execution of the agreement with the railroad they should have so advised the city. In the absence of such action the city was entitled to believe, and the court properly found, that there was substantial compliance with the law. (*Id.,* p. 382. See also *Latipac, Inc.* v. *Superior Court* (1966) 64 Cal.2d 278, 281 [49 Cal.Rptr. 676, 411 P.2d 564]; and cf. *Currie* v. *Stolovitz* (1959) 169 Cal.App.2d 810, 814-815 [338 P.2d 208].)

## VI

In attacking the judgment of the trial court the respondents rely on the following principles: "It is the general rule that the writ of mandamus may not be employed to compel a public administrative agency possessing discretionary power to act in a particular manner. The court in response to appropriate application may compel such agency to act, but it may not substitute its discretion for the discretion properly vested in the administrative agency. [Citations.]" (*Lindell Co.* v. *Board of Permit Appeals, supra,* 23 Cal.2d 303, 315. See also *State of California* v. *Superior Court (Veta Company)* (1974) 12 Cal.3d 237, 247 [115 Cal.Rptr. 497, 524 P.2d 1281]; *Faulkner* v. *Cal. Toll Bridge Authority, supra,* 40 Cal.2d 317, 326; *Cleveland Chiropractic College* v. *State Bd. of Chiropractic Examiners* (1970) 11 Cal.App.3d 25, 47 [89 Cal.Rptr. 572]; and *Conroy* v. *Civil Service Commission* (1946) 75 Cal.App.2d 450, 457 [171 P.2d 500].) If the agency has exercised its discretion it can only be controlled upon "a showing of fraud, arbitrary action or an abuse of discretion." (*Bowles* v. *Antonetti* (1966) 241 Cal.App.2d 283, 286 [50 Cal.Rptr. 370]. See also *Faulkner* v. *Cal. Toll Bridge Authority, supra,* 40 Cal.2d 317, 327; and *Lindell Co.* v. *Board of Permit Appeals, supra,* 23 Cal.2d 303, 319.)

Insofar as the foregoing principles have been relied on to sustain the establishment of a unilaterally established cut off date, they have been

found wanting (parts III and IV above). Insofar as they are relied upon to establish the department's right to consider the review of the status of the projects of other local entities with a higher priority than the petitioning city, they are reviewed below (part VII). We presently examine the right of the trial court to order the allocation to the city.

Section 2456 (see fn. 1 above) refers to "evidence satisfactory to the department." Similar language is used in section 2457 with respect to preconstruction costs. The former section also refers to "necessary orders" and "necessary agreements." Respondents claim that the use of those terms demonstrates a legislative intent to invest sole discretion in the Department of Transportation to qualify any specific allocation from the grade allocation fund to a local agency. (See *State of California* v. *Superior Court (Veta Company), supra,* 12 Cal.3d 237, 247-248; *Rubino* v. *Lolli* (1970) 10 Cal.App.3d 1059, 1063 [89 Cal.Rptr. 320]; and *Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d 803, 817 [25 Cal.Rptr. 798].) When the record is examined, however, it appears that what are "necessary" orders and agreements is determined by law or by orders of the Public Utilities Commission, and that the requirement of an environmental report, and the existence of sufficient local funds are matters to be determined without the exercise of discretion. The expertise of the department is called into play in determining that the project is not used to divert grade separation funds to the improvement of adjacent city streets or county highways, or to unnecessary landscaping. As noted above, the department also checks the benefits in relation to the costs to the railroad to determine whether the railroad is in fact making the contribution required by law.

In this case, unlike *Baldwin-Lima-Hamilton Corp.* v. *Superior Court, supra,* there is nothing to indicate that the Legislature conferred discretion on the department to reject an application of a local agency with a priority falling within the available funds when it did furnish satisfactory evidence of compliance with the statutory requirements. ■ The situation in such a case falls within the rule recognized and applied in *Inglin* v. *Hoppin* (1909) 156 Cal. 483 [105 P. 582], as follows: "While, of course, it is the general rule that *mandamus* will not lie to control the discretion of a court or officer, meaning by that that it will not lie to force the exercise of discretion in a particular manner, the above cases abundantly show that *mandamus* will lie to correct abuses of discretion, and will lie to force a particular action by the inferior tribunal or officer, when the law clearly establishes the petitioner's right to such action." (156 Cal. at p. 491. See also *Manjares* v. *Newton* (1966) 64 Cal.2d

365, 370-375 [49 Cal.Rptr. 805, 411 P.2d 901]; *Dufton* v. *Daniels* (1923) 190 Cal. 577, 580-581 [213 P. 949]; *Rambo* v. *Mattox* (1964) 225 Cal.App.2d 185, 186 [37 Cal.Rptr. 174]; and *Hammel* v. *Neylan* (1916) 31 Cal.App. 21, 25-26 [159 P. 618].) ▮ Here the department, as was the board of supervisors in *Inglin* v. *Hoppin, supra,* was charged with making a factual determination as to whether the requirements established by the Legislature as a condition precedent to the establishment of a further right created by statute had been established. There the matter came before the court on the pleadings and was remanded to permit the trial court to have a hearing on the merits. The court did observe, "The hearing will be had upon the same evidence presented to the board of supervisors. Where a question of fact is doubtful or disputed, the court will not interfere with the determination of the supervisors. But if it be established before the superior court as alleged in the petition, that the evidence before the supervisors was uncontradicted, competent and sufficient to prove satisfactorily all matters required by the Political Code, it will become the clear duty of the superior court to issue its mandate to the board of supervisors to accord to the petitioners the right which the statute gives them." (*Id.,* p. 491.)

The petitioner's pleading and prayer put in issue its right to the allocation. It was supported by exhibits and testimony which reflects compliance with the statutory provisions. The alternative writ directed the respondents to approve the allocation of $1,462,209 or show cause why they have not done so. By demurrer the respondents presented the objections which have been mentioned above, but it was never suggested that the application was deficient other than for lack of what the department considered timely filing of the railroad agreement. Although the answer sets up the defenses that other priorities would intervene (see part VII below), and the failure to present satisfactory evidence of a railroad agreement, it does not otherwise question the material furnished in connection with the application. It is not disputed that the application was considered complete when received by the district office of the department on February 7, 1975, except for the executed railroad agreement, and that when the latter was received on May 1, 1975, the entire application was forwarded with a recommendation that the project be approved and the allocation requested be granted.

At the outset of the trial the attorney for the respondents affirmed the court's understanding that "the crux of the case is that [respondents] maintain that the City of San Marcos did not complete their application within February 15, 1975, which was the deadline." During the

testimony of the first witness for the respondents, the bridge agreements engineer, the court again voiced its understanding, and asked, "Were there any other deficiencies in the San Marcos application . . . ?" He also inquired, "I want to know how the engineering judgment was impeded in this case by not having the railroad application in on February 15th." It was then developed that there had been very little review of the project in the witness' office because when it was received there in the first part of May it was apparent the executed agreement had not been filed prior to the deadline and the application was denied for that reason. The witness did characterize the San Marcos project as a simple type of project and acknowledged that he had a member of his staff look at the engineering aspects of the project as reflected in the application, and he reported that there were no engineering problems. He further stated, ". . . had this been filed on time, the agreement in order, we would not be in court today."

The attorney for the department testified that he received the application after it came from the engineers, who informed him that there was no railroad agreement at the time it was filed in February. He did not know whether or not an engineering review had been conducted. His review from a legal standpoint could vary from one day to two weeks actual work. He had not formally reviewed the railroad agreement in question, although he might have "flipped through" it.

The chief, office of agreements and local assistance in the division of structures of the department, indicated that on May 9, 1975, he recommended against giving the city an allocation because the agreement was not received in time. He stated no formal notice of rejection was given to the city at that time because he "wanted to make doubly sure," and he acknowledged that there was a "possibility of anything happening, any time, anywhere."

The foregoing indicates that there had been no extensive review of the city's application because of the department's views as to the validity of its deadline, and with relation to the priority of the Hollywood Way project. Nevertheless, after the action was filed and the order to show cause was served, there apparently was no attempt made to check the application for the possible deficiencies pending the hearing. Nor do the papers submitted with respondents' motion for a new trial indicate that the department, in the eight weeks between the judgment and the ruling on its motion, attempted to develop any deficiencies in the city's application. It contented itself with attempting to develop possible

prejudice to the County of Los Angeles and to two 1975-1976 applicants if the judgment were permitted to stand.

Under the foregoing circumstances, we believe that the department has waived any right to insist that the matter be remanded to it for further technical review of the city's application. Its failure to raise any technical deficiencies, other than strict adherence to its deadline, negates the existence of any. The findings and conclusions indicating compliance with the statutory requirements must be upheld.

## VII

By demurrer and answer the respondents insisted that if the February 15, 1975 deadline was invalid, the petitioning city would not be entitled to relief, because the County of Los Angeles which had a 1974-1975 priority of 21 for a project over Hollywood Way at an estimated total cost of $4,167,000 would be entitled to an allocation of $3,351,600. That allocation would reduce the grade separation fund to an amount insufficient to insure the construction of the city's project. The respondents further claimed that it would be necessary to canvass all other agencies with a priority lower than the petitioner who had not been allocated funds, and give any who so desired an opportunity to file a tardy application. ■ On the motion for a new trial it was further suggested that an allowance to petitioner would prejudice two of the agencies on the 1975-1976 priority list if the funds reportedly available in June 1975 were not carried over to the ensuing fiscal year.

The court found, on the basis of data testified to by the respondents' witnesses at the hearing June 27, 1975, that for the fiscal year 1974-1975, $15,921,461 had been allocated to 10 projects with a priority of 22 or lower, leaving a balance in the grade separation fund of $3,880,014.09. It also appears that no applications were submitted for 10 projects with a higher priority than the city, and one other had been withdrawn.[10] The court so found.

The record reflects that the County of Los Angeles submitted a request for an allocation to the Hollywood Way project on February 14,

[10]The chief of the office of agreements and local assistance testified that "up until just a short two weeks ago it appeared that we would only get to priority No. 9 [9 crossings in the City of Alhambra with an estimated total cost of $13,200,000], due to the fact that we had requested allocation[s] that would have exhausted the fund at priority No. 9, and today [June 27, 1975] priority No. 9 withdrew their allocation request, which enabled us to allocate up through and including priority No. 22 [i.e., 11, 14, 15, 19 and — or half of those who were recommended for allocations]."

1975, without including an order for construction. This application stated, "1. On November 25 and 26, 1974, at a PUC hearing in Los Angeles, the County and the Railroad agreed to apportionment of the cost of providing for an additional track as decided by the Commission in the decision of that hearing. This was the only area of disagreement between the parties that delayed finalizing *the construction and maintenance agreement.* This matter will be resolved shortly by a PUC decision and the necessary agreement will be executed subsequent to the decision. You will be forwarded three copies of both the decision and *agreement* when they are available." (Italics added.)

On June 11, 1975, the local district was advised that the county's application had failed to qualify for an allocation from the 1974-1975 grade separation fund by reason to file a timely application because it did not contain a valid order by the Public Utilities Commission authorizing construction of the grade separation.

The court found: "8. The PUC did not issue its order authorizing the Los Angeles Hollywood Way Project, designated as priority No. 21, until May 13, 1975. To date, there is no executed railroad agreement between the County of Los Angeles and the affected railroad, Southern Pacific, as per section 2456. To date the County of Los Angeles has not completed its application; [¶] 9. The City of San Marcos project No. 23 is the next eligible recipient of an allocation from the 1974-75 grade separation fund. It has requested an allocation of $1,462,209.00 from the 1974-75 fund. There is a present available balance in the fund of $3,880,014.09. If said funds are not allocated before July 1, 1975, they will revert to the 1975-76 great [*sic*] separation fund, with a new list of priorities."

Respondents attack the foregoing findings because they do not acknowledge that Los Angeles County is entitled to be first in priority if further allocations are authorized. They contend that if the city's application was completed on May 1, when the agreement was filed, the county's application was completed on May 13, 1975, when the Public Utilities Commission made its order authorizing construction and further providing, "2. The cost of the authorized project shall be apportioned as follows: 90 percent of the cost to be borne by the county of Los Angeles and 10 percent of the cost to be borne by the Southern Pacific Transportation Company."

The respondents offered testimony to show that in view of the apportionment of costs set forth in the order it was not necessary for the

county to file an agreement in order to be eligible for an allocation or do the work. They pointed out that project No. 6, also with Los Angeles County, for Hacienda crossing, had been approved on the basis of a similar order, without the necessity of an agreement between the agency and the railroad. That testimony was qualified by admissions that it was convenient to have an agreement defining the scope of the work to be done by the railroad and the public agency, the insurance to be carried and presumably the indemnity to be assumed, rights of entry, and other matters. It was acknowledged that proceeding without an agreement was exceptional and that it would be cumbersome to proceed through contempt powers of the Public Utilities Commission in the absence of agreement. Other testimony indicated that an agreement had been negotiated and approved by the railroad for the Hacienda project on April 1, 1975. An engineer for the railroad further testified, as did an official of the department, that no agreement had been executed for the Hollywood Way project by either party as of June 27, 1975, the date of hearing. The railroad engineer stated, "At this time we are still waiting for Los Angeles County to complete the scope of the project for submission to our management. We have not started preparation of the agreement to date." He further indicated that it would be impossible to execute an agreement before the end of the fiscal year, and although the railroad could be committed to the project, it would be subject to agreement.

The statute requires "that all necessary agreements with affected railroad or railroads have been executed." The county's letter of transmittal acknowledged that its application lacked not only an order for construction, but the necessary agreement to be executed subsequent to the decision. The trial court did not err in construing the statute, contrary to the opinion of the department, as requiring an agreement to supplement the order, which did no more than settle a dispute about responsibility for the costs attendant to a second track and then allocated the Hollywood Way costs according to law. Its finding of no agreement and no qualification for an allocation are sustained by the evidence.

Section 2460 provides: "If more projects comply with the requirements of this chapter than can be financed from funds set aside for purposes of this chapter, allocations shall be made to those projects highest on the priority list established pursuant to Section 2452. The commission may make allocations for any project when it determines, at the time of allocation, that sufficient funds are available for all projects which are higher on the priority list and which are, or are reasonably expected to become, eligible during the fiscal year."

Officials of the department testified that if the deadline were avoided it would be necessary to canvass all the agencies with higher priorities before allocating anything to petitioner. That contention is ridiculous. There was no unsuccessful applicant, other than the County of Los Angeles, who could on June 27, 1975, be deemed to have complied with the requirements of section 2456, nor could any of those other agencies reasonably be expected to become eligible during the fiscal year 1974-1975. The agencies who might lose out because funds were not carried over into the ensuing fiscal year have no vested right in that contingency. If the City of Alhambra had not withdrawn its application presumably there would have been no carry over. They cannot complain because San Marcos is added to the group benefiting from the withdrawal of the other city's application.

 The rights of others which the respondents seek to assert are barred by laches. Although amici curiae have appeared in support of the city's position, this is not a class action. The matter "is really controlled by the well-settled principle found in section 3527 of the Civil Code: 'The law helps the vigilant, before those who sleep on their rights.'" (*Griffith* v. *List* (1932) 122 Cal.App. 125, 129 [9 P.2d 529].) It is San Marcos which pressed its claim for the invalidity of the regulations to recognition of its right to an allocation. The failure of the County of Los Angeles or others with a higher priority to join in the city's attack on the regulation precludes their sharing in the fruits of San Marcos' successful litigation.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.